**AUSTIN VILLAGE, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. C 65–89.**

United States District Court
N. D. Ohio, E. D.

Dec. 10, 1968.

George Meisel and Edmund Durkin, Jr., of Squire, Sanders & Dempsey, Cleveland, Ohio, for plaintiff.

Bernard J. Stuplinski, U. S. Dist. Atty., and Carl H. Miller, Asst. U. S. Atty., Cleveland, Ohio, Mitchell Rogovin, Asst. Atty. Gen., David A. Wilson, Jr., and Lawrence J. Ross, Attys., Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM

BEN C. GREEN, District Judge.

This is a suit for refund of income taxes in the amount of $622.95 plus statutory interest for the year 1958. Deficiencies for other years are being held in abeyance at the administrative level pending the decision herein.

The issue in this action is whether certain advances made by stockholders to the plaintiff corporation were loans, so as to entitle the plaintiff to deduct accrued interest thereon for income tax purposes, 26 U.S.C. § 163.

The plaintiff corporation came into existence in 1953 as the outgrowth of a land transaction entered into by certain individuals. In that year Mr. Milan Kapel, who had previously been active in the real estate business, became aware of the opportunity to acquire an option on a large tract of land near Warren, Ohio, at a favorable price. The opportunity was brought to his attention by two friends, Mr. Edward F. Kovac and Mr. Don W. Reed. These three individuals proceeded to acquire an option on the land.

The plaintiff corporation was organized in June, 1953 and the option was assigned to the corporation. No cash was paid in to the corporation by these original parties. Shortly thereafter two additional shareholders joined the corporate venture, Mr. John W. Welsh and Mr. Don Farinacci. Of these five parties Mr. Farinacci was the only one to invest any cash in the corporation at that time, in the amount of $25,000.

Mr. Kapel testified that the parties' intent at the time of acquiring the option was to sell the land, but that if they were unable to arrange a sale to proceed to develop it. At the time of acquisition they had no specific plans as to improving the property. At about that time the Chrysler Corporation was looking for a large tract, and they had hoped to interest Chrysler in the parcel. That possibility did not materialize.

When it began to appear that an immediate sale of the land was not imminent, the investors began to consider alternative developments thereof. As a part of that consideration steps were taken to have the land annexed to the City of Warren, Ohio. Mr. Kapel testified that, based on his past experience, if it became necessary to develop the land, improvements could be put in on an assessment basis with the tract a part of the city. On an assessment basis it would not be necessary for the plaintiff to pay improvement costs in conjunction with development of housing lots as they were incurred. With regard to the possible cost of developing a shopping center on the land Mr. Kapel stated that the investors anticipated securing one hundred percent financing on the construction costs. On such a basis no substantial amounts of additional capital would have been required from the stockholders of Austin Village, Inc.

As matters developed, the plaintiff was unable to secure conventional financing for development of the property, although serious efforts were made in that direction. Consequently, when the need for operating funds to meet expenses arose the shareholders made advances to the corporation and took notes in return.

The first such transaction reflected by the record appears from minutes of a Special Board Meeting of October 10, 1953. At that meeting it was proposed that each of the shareholders advance $10,000 to the corporation. Mr. Reed did not agree to the proposal and a resolution was passed that each of the other shareholders would make such a loan. On October 30, 1953 a second resolution was passed authorizing the corporation to borrow the $10,000 agreed upon at the October 10th meeting from each of the

shareholders other than Mr. Reed and to issue demand notes bearing interest at 8% to each of the lenders.[1]

At a Special Meeting of the Board of April 1, 1954 another resolution was passed authorizing the corporation to borrow $5,000 from each of the shareholders, excluding Mr. Reed, to be evidenced by demand promissory notes. At that same meeting the corporation accepted an offer by Mr. Reed to surrender his stock.

With regard to the withdrawal of Mr. Reed, the question was posed whether his divorce from the venture was as a result of his failure to make loans to the corporation as the other shareholders were doing. On cross-examination of Mr. Kapel he was asked whether the making of such loans was mandatory on a shareholder who wished to remain a part of the venture. Mr. Kapel indicated that the corporation needed money and it had to come from the shareholders. By reason of the fact that Mr. Reed had not participated in the first loan to the corporation, this Court cannot find that the loans made at that time were mandatory. While it is probable that the other investors may have indicated that Mr. Reed should either help shoulder the continuing financial burdens of the corporation or leave the group, it is also possible that his departure was a voluntary move on his part to separate himself from what appeared to be a losing venture. The record is insufficient for the Court to make a positive finding on this point.

During the summer of 1954 each of the remaining shareholders advanced another $2,000 to the corporation, to bring the total advances to $68,000. On the 1954 year-end balance sheet under fixed liabilities there appeared the item "Demand notes payable due officers—$68,000."

The record contains the minutes of a Special Meeting of the Board of Directors held June 11, 1955. Those minutes recite the following:

"The President stated that the corporation needed to bolster its financial situation and that further cash would be necessary in order to purchase the real estate for the shopping center.[2] It was considered that the sum of $60,000.00 would be needed to accomplish this and the corporation's financial affairs were discussed in considerable detail.

"It was considered that all of the money loaned by the shareholders heretofore together with a further contribution of $15,000.00 each should be changed to contributions to paid in surplus rather than carrying as an indebtedness of the corporation.

"Upon motion made, seconded and unanimously carried, it was resolved that the loans made by the shareholders on October 10, 1953, April 1, 1954, August 1, 1954 together with an additional sum of $15,000.00 to be paid by each shareholder be carried by the corporation as paid in surplus and that all evidence of indebtedness for said amounts should be cancelled and returned to the corporation. It was stated that this resolution would authorize the total sum of $128,000.00 paid and to be paid by the shareholders to be carried as paid in surplus and not be an indebtedness of the corporation.

"It was further considered that after the corporation's financial position became more advantageous some method would be employed by the corporation to return a part or all of said contributions to the shareholders."

The minutes of the next Board meeting held on July 15, 1955, recited that "all

---

1. Certain of the loans were made by businesses controlled by the individuals concerned. For the purposes of this opinion those loans will be treated as made by the shareholders.

2. As a part of the option contract the parties agreed that the buyers would construct a new home for the seller on other land. The house so built was of a value of approximately $100,000. It appears from the record that this reference to cash necessary to purchase the real estate pertains to the necessity of raising money to proceed with construction of that house.

of the directors had returned their evidence of indebtedness to the corporation and that the sum of $128,000 borrowed by the company had now been allocated to paid-in surplus." The minutes further reflect, however, that the question of "a possible return of said paid-in amounts was discussed," and that the corporation expressed a "willingness to repay the amounts advanced by the directors at such time and in such manner as the law may permit, careful consideration being given to the rights of existing creditors."

The accounting records of the corporation are not completely consistent with these recorded resolutions of the Board of Directors, nor was the testimony at the trial consistent therewith. While a financial statement dated June 30, 1955 contains as a part of its paid-in surplus analysis $128,000 as "Shareholders' and officers' cash working capital contributions, subordinated to creditors' accounts, not subject to withdrawal until July 1, 1956, and then only by Board of Directors' sanction," another financial statement prepared by the same C.P.A. dated October 31, 1956 shows "Notes payable, stockholders—$128,000" classified under Fixed Liabilities. Further, when the shareholders first began making advances, notes payable accounts in their names were established in the corporation's general ledger. After adoption of the resolution under consideration the $128,000 total reflected in the notes payable general ledger accounts was not transferred to the surplus account in the general ledger. It may also be noted that the June balance sheet description of the conditional right of withdrawal of the $128,-000 after July 1, 1956 with the subordination to creditors proviso does not correspond to the terms of the transfer to paid-in surplus as reflected by the corporate minutes.

The next Board of Directors Meeting shown on the record was August 10, 1956. Present at that meeting in addition to the four shareholder-directors were a builder, two real estate brokers and two officers of the Fraser Mortgage Company. The declared purpose of the meeting was "to consider the advisability of continuing with the shopping center on West Market Street, Warren, Ohio, without further assistance on additional leases." The minutes reflect that several potential tenants were discussed with a view to securing leases, but that the builder was instructed to proceed with construction only on those stores for which signed leases had already been secured. He was further instructed to proceed with construction on a service station after obtaining the mortgage and construction money for the station. Although the record is unclear, it would appear that this represented the beginning of actual construction on the center. Mr. Kapel testified that construction began some time late in 1956 or early in 1957, and the minutes of this meeting are the first record reference to any construction work.

At that same meeting the question of the corporation's finances also was taken up, and it was determined that the corporation would borrow an additional $25,-000 from each of the shareholders to be evidenced by demand notes. It would appear that the presence of the Fraser Mortgage representatives at that meeting was related to the corporation's financial problems, as Mr. Kapel testified that the corporation gave Fraser Mortgage, as a broker, a mortgage on the shopping center in an attempt to secure construction money from other lenders, but that Fraser Mortgage was unable to do so. From Mr. Kapel's testimony it appears that the corporation began construction of the shopping center having secured only a few tenants and no bank construction loans, with the expectation that the beginning of actual construction would attract both tenants and financing. He stated on cross-examination:

"In other words, they [the advances] were because we were unable to obtain a construction loan. Now, normally we would have a construction loan, drew money from that account and paid our bills. Unfortunately, in this particular set-up we were advised to go ahead and start, we will get tenants if people

see that some brick and mortar is laid, and that we will be able to get a loan. And, of course, like you say, being novices, we maybe were misled, but—and this is what happened.

So when we started we had two choices, either leave it, walk away from it and let it go bankrupt, or until we got our permanent loan keep loaning it money."

Subsequent to that meeting the shareholders continued to make advances to the corporation. On a balance sheet of October 31, 1956 the sum of $228,000 was shown as a part of the corporation's surplus under the designation:

"Shareholders' cash and note receivable capital contributions, subordinated to creditors' accounts, not subject to withdrawal without Board of Directors' sanction."

The sum of $335,500 was shown on a financial statement dated February 14, 1957 under the same caption. It thus appears that from an internal accounting standpoint the plaintiff did not differentiate between the advances made prior to the adoption of the July, 1955 resolution pertaining to the transfer of the $128,-000 to paid-in surplus and those advances made thereafter.

The next significant occurrence in the plaintiff's history, as shown by this record, is detailed in the minutes of a Board of Directors' Meeting held August 13, 1957. The minutes first recite that the plaintiff had pending with the Jefferson Standard Life Insurance Company of Greensboro, North Carolina, a loan application in the amount of $750,000. After considering other corporate affairs the matter of finances was taken up. The minutes relating to that question are as follows:

"Mr. Farinacci brought to the attention of the board that Mr. Black was in need of additional money to continue the operation of the shopping center job until adequate financing could be arranged.

"After thorough discussion and upon motion by Milan Kapel, it was resolved that, it would be necessary to redeem all the stock and notes issued to Milan Kapel, Edward Kovac, Don Farinacci and J. W. Welsh for the purpose of redeeming all stock and note issued before the above date, and to re-issue new stock and notes in proportion of the investments of each shareholder. The schedule for stock re-issue would be as follows:

"That stock would be re-issued back to Milan Kapel, Edward Kovac, Don Farinacci and J. W. Welsh in the amounts of an existing investment or any additional investment that they cared to make at this time only.

"The new stated value of the no par common stock would be $1,000.00 per share with a $3,000.00 mandatory loan from the subscribing shareholders or other sources coupled with each share purchased, upon which Austin Village, Inc. would issue in addition to the share of common stock a cognovit note which would be subordinated to Austin Village, Inc. creditors and not payable for the period of two years or after, unless it was the unanimous decision of the Board of Directors that Austin Village, Inc. could reduce the time limit of these notes.

"All additional shares would be sold to the existing shareholders with a majority board approval. All shares of stock sold outside of the four existing shareholders would have to have a unanimous decision of the board. The following is the revised stock schedule and authorization for issuing notes at 6% interest as before stated:

Don Farinacci 35 shares—Note from Austin Village, to Don Farinacci for $99,000.00 and note from Austin Village, Inc. to Farinacci Lumber Co. for $6,000.00

J. W. Welsh 25 shares—Note from Austin Village, Inc. to East Ohio Lumber Company for $50,000.00 and note from Austin Village, Inc. to East Ohio Roofing for $25,000.00

Milan Kapel 23 shares—Note from Austin Village, Inc. to Lepak, Inc. for $69,000.00

Edward Kovac 13 shares—Note from Austin Village, Inc. to Edward Kovac for $39,000.00.

Total of shares issued—96

Total of notes —$288,000.00

"All other stock as returned will be returned as treasury stock.

"The foregoing resolution was seconded and unanimously carried by roll call vote.

"Mr. Black was ordered to prepare the new stock certificates and notes in accordance with the above resolution and schedule, and advise Jefferson Standard of the change in the stock structure of the company.

"It is further moved, seconded and unanimously adopted that the above plan should be submitted to the shareholders of record as of this date and each of the shareholders approve in writing the above plan; that it will again be taken up at a subsequent directors' meeting by the directors after it has been approved by all of the shareholders."

At the next Board meeting, which appears to have been held on August 17, 1957, the minutes reflect adoption of the recapitalization plan following stockholder approval thereof. The minutes of that meeting also state that any future stock sales must be for a price of not less than $1,000 per share and that any sales to present shareholders shall be authorized only upon a majority vote of the Board of Directors, whereas sales to new parties would be authorized only upon the unanimous approval of the Board. While the plan as adopted by the Board provided for the immediate purchase by existing shareholders of additional shares upon the condition that they also loan the corporation three times the purchase price of the stock, no such condition was specifically attached to future purchases by present or prospective shareholders.

Although the notes actually issued by the plaintiff prior and subsequent to the recapitalization were destroyed following their recall,[3] there are in evidence form notes of the types utilized. It appears that prior to the recapitalization the corporation utilized a standard printed form demand cognovit note. Following the reorganization the corporation issued a specially prepared note which recited that it bore interest at 6% per annum, was due two years after date, but that the maturity date could be accelerated by a unanimous agreement of the Board of Directors and was subordinated to corporation creditors exclusive of any mortgage loans. The cognovit provision of the prior notes was retained.

The shareholders continued to make advances to the plaintiff during 1957 and into 1958. Those advances were allocated by the corporation to stock and loans on the basis of 1 to 3. Although the note payable accounts of the individuals were not adjusted to reflect the August recapitalization until the end of the calendar year 1957, the financial statements prepared during 1957 did reflect the recapitalization. As part of a financial statement dated November 30, 1957 the sum of $396,000 appears under the legend:

"Shareholders' cash working capital contributions, representing by official corporate action 300% of individual capital stock holdings; subordinated to creditors and not subject to withdrawal except by Board of Directors' sanction."

On a 1957 year-end financial statement the sum of $456,000 is shown under the same heading. In addition, that statement contained an exhibit setting forth the total advances by, or on behalf of, the shareholders from 1953 to the date of the statement with allocations of the totals between capital stock, in the sum of $152,000 and loans in the sum of $456,-000. The characterization of the "Shareholders' cash working capital contributions" in the 1957 financial statements as "not subject to withdrawal except by

3. As will be seen hereinafter the notes issued in conjunction with the recapitalization were subsequently recalled.

Board of Directors' sanction" does not accord with the reorganization resolution or the face terms of the notes issued by plaintiff, and that language is a continuation of the treatment accorded to the shareholders' advances prior to the recapitalization.

Mr. Kapeal testified that all advances, which were made on irregular dates, were used to meet the construction expenses of the shopping center. The center was not completed until some time in 1958, although the first tenant moved in early in 1958 prior to completion of all construction. Mr. Kapel stated that the actual costs of construction were much higher than originally anticipated.

There is some confusion on the record as to when the first outside money came into the corporation. Although a stipulated schedule of non-shareholder loans lists $250,000 as being borrowed from the Union Savings and Trust Company of Warren, Ohio, in December, 1957, a stipulated exhibit contradicts that fact. The individual shareholders were required to personally guarantee the loan by reason of the refusal of two contractors to waive priority of liens in favor of the bank. The guarantee agreement is dated January 17, 1958 and recites on its face that the loan application was then pending. The notes payable ledger for Union Savings and Trust shows an initial entry of $100,000 as of January 31, 1958, increased periodically by $50,000 advances to $250,000 by June 30, 1958. These facts would indicate that the plaintiff did not borrow $250,000 from the bank in December, 1957.

The record is further confused as to plaintiff's dealings with the Union Savings and Trust Company. The stipulation recites that the plaintiff borrowed $250,000 from that bank in December, 1957 and $650,000 in September, 1958. It was further stipulated that the $250,000 loan was unpaid in September, 1958 and the $650,000 loan was secured, in part, by the proceeds of a loan from the Jefferson Standard Life Insurance Company. The $650,000 note on its face recites that it is secured by a real estate

mortgage, by assignment of lease rentals and by other collateral. The stipulated schedule of non-shareholder loans shows, as previously noted, a $250,000 loan from the Union Savings to the plaintiff in December, 1957 repaid in 1958 and a $650,000 loan in September, 1958 unpaid as of the end of the year. The plaintiff's note payable general ledger account for Union Savings and Trust shows a balance of $250,000 owing as of August 31, 1958 and an addition thereto of $400,000 September 30, 1958 with the entire balance cleared as of January 31, 1959. It would thus appear that the $250,000 loan was not in fact paid in 1958 but was refinanced as a part of the $650,000 transaction. The stipulated loan schedule reflects no loan from the Jefferson Standard Life Insurance Company, nor is there any evidence in the record documenting such a transaction. There is, however, in a general ledger account headed "interest" entries reflecting the payment of interest to "Jefferson" in the years 1958 and 1959. As that stipulated exhibit commences as of August 31, 1958 it sheds no light on what may have preceded it, and only serves to further confuse the record in this regard.

These discrepancies on the record regarding the plaintiff's finances are not restricted to dealings with the Union Savings and Trust. The stipulation recites that the plaintiff borrowed $32,000 from the Second National Bank of Warren, Ohio in June, 1958 which was repaid in August, 1958 and an additional $7,000 in August, 1958 which was repaid subsequent to the year 1958. The stipulated schedule of non-shareholder loans is in accord with that recitation. The plaintiff's ledger cards, however, show a $25,000 loan from the Second National Bank as of January 31, 1957 which was paid in August, 1958, at which time the balance was $19,523.92, and the establishment of a new note payable in August, 1958 in the amount of $7,000. The plaintiff's 1957 financial statements show a note payable to the Second National Bank in an amount corresponding with the ledger card.

It may be noted that all of the foregoing documentary evidence was received pursuant to stipulation. In that regard, there are further inconsistencies among certain stipulated records. The most serious of these is contained in a schedule captioned "Stock Certificates issued pursuant to August, 1957 recapitalization." That schedule reflects that as of August, 1957 Mr. Farinacci had made total advances of $123,000 and that the allocation thereof in the recapitalization was $12,000 to stock and $111,000 to loans. That is entirely at odds with all other evidence in the record, and the totals in the said schedule of $69,000 in stock and $285,000 allocated to loans for all shareholders does not correspond with other stipulated facts. The other areas of discrepancy relate to variations between stipulated schedules of shareholders' advances and the plaintiff's accounts with regard thereto as to some amounts and dates, although the final figures do jibe. The plaintiff's records were received in evidence pursuant to stipulation between the parties.

The next official corporate action shown on this record was at a Board Meeting of March 26, 1958. At that meeting the Board authorized the sale of Treasury Stock to five or less prospects, subject to the unanimous approval by the Board of Directors, at a price of $1,000 per share conditioned upon the purchaser making a mandatory loan of $3,000 per share purchased.[4] This imposition of a conditional right of purchase is only the second official corporate action of that nature. The corporate resolution adopted at the time of recapitalization had such a restriction as to additional stock to be taken during recapitalization, but did not impose any such continuing restriction on existing shareholders. Therefore, on the face of this record, the post-recapitalization allocation of continuing advances on a 1 to 3

basis cannot be said to have been responsive to any obligatory duty imposed by official corporate action, although it would certainly seem to have been by agreement or direction of the shareholders. As is pointed out hereinafter, there appears to have been an instance in 1958 when the alleged 1 to 3 requirement was not enforced. As to the reason for taking in new shareholders, Mr. Kapel testified:

"That was when we didn't get enough money from our permanent financing, and I believe everyone was pretty well exhausted by now and couldn't get any more money. Then we got additional shareholders."

Pursuant to the corporate resolution, new shareholders were brought into the venture. That action is evidenced by a contract dated August 15, 1958 between the existing shareholders, as individuals, as parties of the first part, and A. H. Ganger M. E. Ganger, M. L. Ganger and Joseph A. Krizman as parties of the second part. The contract recited that the parties of the first part had purchased stock in and made loans to Austin Village, Inc. and were interested in having the second parties also purchase stock and make loans to Austin Village, Inc. The contract further recited that the capital stock holdings and loans of the first parties were as shown on the corporation's books. It was then provided that:

"The said [first party] loans bear six per cent (6%) interest from the dates thereof, and that at the maturity thereof the time of payment thereof will be extended, so that the notes and interest due on loans of the First Parties and of Second Parties will become due and payable at the same time. However, regardless as to the due dates of notes above mentioned, payments

---

4. The record further reflects, however, that as of December 11, 1957 Eleanor Ververka was issued one share of common stock and made a $3,000 loan to the corporation. There is some indication that Eleanor Ververka may have been a nominee of Mr. Farinacci, as both her share of stock and loan balance were transferred to Mr. Farinacci in 1964, but there is no evidence on this point and the record remains unclear.

will only be called for with the approval of all parties."

The contract also provided that all loans of both first and second parties would be subordinated to creditors of Austin Village, Inc.

On the same date that the Ganger contract was executed the plaintiff's outstanding notes to shareholders were recalled and new notes issued in their place. The new notes bore interest at 6% per annum and stated that "principal and interest shall be due September 1, 1963." The notes further provided, however, that:

"Said principal and interest shall be payable before or after the aforesaid due date upon a date to be determined by unanimous approval of all parties to the contract of August 15, 1958, between J. W. Welsh, et al., and A. H. Ganger, et al., and shall be payable ratably with the several notes issued by Austin Village, Inc. to each of the said parties or others that they have caused to make loans to Austin Village, Inc.

"The provisions of said contract are incorporated herein by reference and made a part hereof."

On August 18, 1958 a stock certificate for 10 shares was issued by the plaintiff in the name of Joseph Krizman. On that same date the corporation issued a $30,000 note to Mr. Krizman identical in form to those issued to existing stockholders on August 15, 1958, and a note payable account was established on the corporation's records for Mr. Krizman for $30,000.

Also on August 18, 1958 a stock certificate was issued in the name of M. L. Ganger for 15 shares. The note which was issued in conjunction with that transaction in the sum of $45,000 was not in favor of M. L. Ganger but rather in favor of A. H. Ganger, and the note payable account established on the plaintiff's books was likewise in the name of A. H. Ganger. This apparent anomaly, as well as the failure of the plaintiff to issue any stock to A. H. Ganger and M. E.

Ganger, who were parties to the August 15, 1958 agreement, is explained on the record. By written stipulation it was agreed that M. L. Ganger and M. E. Ganger are related to A. H. Ganger and by oral stipulation it was agreed that "as to their investment in Austin Village, Inc., A. H. Ganger and M. L. Ganger were acting cooperatively."

The next significant event which is documented on this record occurred September 12, 1958. There is in evidence a note in the amount of $650,000 in favor of the Union Savings and Trust Company bearing that date. That loan has been the subject of previous consideration herein. The loan was personally guaranteed by Messrs. Farinacci, Welsh, Kapel, Kovac and their wives. While the personal guarantee was not signed by Eleanor Ververka, Joseph Krizman and Mark Sperry, who were shareholders at the time, it was signed by A. H. Ganger who, on the face of the corporate records, had no ownership interest in the plaintiff.

The role of Mark Sperry in this corporation's affairs is a total mystery on this record. On August 15, 1958 a stock certificate for two shares was issued in his name. The stipulated schedule of shareholders' advances for which stock certificates were issued shows a $2,000 advance by Mr. Sperry as of June 25, 1958. Although there was a note payable ledger card established for Mr. Sperry in the sum of $4,000 as of June 30, 1958 the general ledger notes payable account in his name for that amount shows an opening date of August 31, 1958 and his name does not appear at all on the stipulated schedule captioned "Summary of Austin Village Shareholders' Advances from August 26, 1957 to December 31, 1958 from cash receipts and notes payable ledgers." Assuming that Mr. Sperry did invest a total of $6,000 in the plaintiff corporation it was allocated on a 1 to 2 basis, rather than the stated mandatory 1 to 3 ratio. Finally, although it appears from the record that Mr. Sperry still retains his stock interest, it further appears that his loan was re-

paid by November 30, 1958, the general ledger account being cleared as of that date and the other ledger accounts showing no traceable transfer of the balance. Although there are in evidence duplicates of all other notes issued to shareholders as of August, 1958, there is none for Mr. Sperry. The Court therefore has no indication whether his loan was subject to the same conditions as the other shareholders, but the reasonable assumption is that it was. If that be true, the record contains no evidence that the unanimous shareholder approval for repayment of the said loan was secured. All of these facts are noted to indicate that this record contains stipulated material which has been completely disregarded by the parties which may be relevant and possibly even critical to the issues herein.

The next documented transaction of importance pertaining to the plaintiff's affairs was a loan in the amount of $100,000 by A. H. Ganger. The note issued for said loan was dated September 26, 1958. The stipulation recites that the loan was secured by a real estate mortgage and was not subordinated to subsequent creditors. Mr. Kapel testified that the loan from Mr. Ganger was necessary because the corporation had not obtained sufficient money on its permanent financing.

As previously mentioned, the original shareholders had continued to make periodic advances to the plaintiff following the 1957 reorganization, and they continued to do so on an irregular basis in 1958. The new shareholders made no advances other than their initial investments. A 1958 year-end financial statement showed under net worth $226,000 in capital stock based on 226 issued shares at a $1,000 par value and in the surplus analysis the sum of $681,000 under the heading "Shareholders' cash working capital, etc." The surplus heading was stated to have been intended to be a continuation of the descriptive material applied in the prior financial statements.

The remaining documentary evidence pertains to repayment of certain of the loans. It appears from the record that a $50,000 payment was made on the $100,000 Ganger loan in January, 1959 but that an additional $25,000 was advanced by Mr. Ganger in July, 1959. The record is silent as to the terms and conditions of that later loan. The balance on the said loan was paid by October 31, 1964. It has been stipulated that interest payments were made annually during the years 1958 to 1962. Although the stipulation states that the loan was made at 10 per cent interest the face of the note states that the note carried interest at the rate of eight per cent per annum. In any event, under the stipulation it would appear that Mr. Ganger received no interest on the $65,000 balance due him as of January, 1962.

As to the $650,000 note due Union Savings and Trust Company the stipulation states that it was repaid with interest subsequent to 1958. The plaintiff's general ledger account for that loan would indicate that it was paid by January 31, 1959.

The record does not reflect when the $7,000 loan secured from the Second National Bank was liquidated, and the stipulation only places the date as subsequent to 1958.

The record further reflects that as of December 31, 1964, subsequent to final payment of the $100,000 Ganger loan, the $45,000 note payable account in the name of A. H. Ganger was transferred in equal shares to the accounts of Mr. Farinacci and Mr. Kapel. Plaintiff's stock register indicates that the 15 shares of stock which had been issued to M. L. Ganger had been transferred in equal shares to Mr. Farinacci and Mr. Kapel as of December 26, 1963, a full year prior to the transfer of the loan account.

An account for "accrued interest-stockholders" was not established on the plaintiff's books until 1958, and was not claimed as a deduction for income tax purposes until that year.

This concludes the résumé of the pertinent documentary evidence in this record, virtually all of which was received in evidence as exhibits to a joint stipula-

tion. There remains certain testimonial evidence which is relevant to the issues.

Mr. Kapel, Mr. Farinacci, Mr. Welsh and Mr. Krizman each testified at the trial. Mr. Kovac was stated to be in the hospital at the time of trial. Each of the witnesses testified that the advances carried on plaintiff's books as loans payable to them were in fact intended to be loans. Mr. Krizman testified that he would not have made a capital investment of $40,000 in the plaintiff corporation.

With regard to the question of any demand for repayment of principal or payment of interest or the date upon which any such payments were anticipated, although the testimony of the witnesses varied in detail the general theme throughout was that payment had been and still was anticipated, but that the corporation's finances had not yet reached the point where it could be said with any certainty when payment would take place. In short, their position was that there was no point in making formal demands on the corporation when they knew the money wasn't there.

On cross-examination Mr. Kapel flatly stated that if the corporation had been able to get financing from outside lenders the shareholders would not have made the advances to meet construction expenses.

Mr. Albert F. Turrell and Mr. Edward Gerberry, each of whom had been plaintiff's internal bookkeeper at one time, also appeared as witnesses. Mr. Turrell stated that:

* * * the shareholders always indicated that these were loans subject to certain restrictions but they confidentially expected to be repaid as soon as practical, with the interest.

Although Mr. Gerberry was not questioned as to whether the shareholders ever directly spoke to him regarding the advances, the general import of his testimony lends itself to the conclusion that he considered the advances to be as the plaintiff's books reflected.

Mr. Turrell and Mr. Gerberry also testified as to the financial statements which are in evidence. Mr. Gerberry simply identified one such statement and the bulk of the evidence in this regard is from Mr. Turrell.

Mr. Turrell stated that most of the financial statements in question had been prepared for the corporation's internal use or had been prepared for submission to financial institutions in order to obtain construction loans. After having identified the December 31, 1954 balance sheet which reflected the notes payable under liability Mr. Turrell was questioned regarding the October 31, 1956 financial statement which reflected the shareholders' advances as a part of surplus. He stated that this latter entry was a continuation of the earlier notes payable account but that the designation thereof had been changed because:

* * * we found it necessary to emphasize in every way we could the fact that these monies were to be subordinated to the general claims of the creditors, particularly to the institution or person who would advance the construction loan, and we found that this was the best way to do it. But we qualified it every time it was so done, either by a note on the face of the balance sheet or by reference on the balance sheet to an analysis of the surplus accounts, which was an integral part of the report.

A similar explanation was made as to the surplus category of the other financial statements in evidence.

On cross-examination Mr. Turrell adhered to this explanation. He was asked if the advances were handled any differently following the 1957 recapitalization. He responded:

Not essentially different. We considered it true liability, notes payable, and it was so indicated on the books of account at all times.

I think, though, that beginning in '57 we included it in the net worth section

of the balance sheet, with the proper explanation following so there could be no misleading on it, simply to emphasize to the hoped for advances of the construction funds that he would be first as far as payment was concerned. That was the only concession.

Although counsel for the defense attempted to obtain an admission from Mr. Turrell that the classification of the shareholders' advances under surplus was improper if they represented loans, Mr. Turrell would not agree. He maintained that the circumstances surrounding the financial problems of this corporation were so unusual that the type of financial statements prepared for internal use and submission to creditors was appropriate. While he stated that under normal conditions loans are carried on financial statements as a liability, he testified that these were not normal conditions. He characterized it as a situation "that wouldn't occur once in a thousand times."

Mr. Turrell was also cross-examined with regard to the fact that the account for accrued interest was not established until 1958. He explained that the reason for the delay was that the corporation did not actually get into business until the shopping center opened in 1958, and that business expenses are not accrued until the business is in actual operation.

This completes the résumé of what the Court believes to be the relevant evidence in the record.

The issue of law in this case is whether the plaintiff has sustained its burden of proving that the advances on which the accrued interest deduction has been claimed as an expense for income tax purposes were in fact loans. Many case authorities have been cited and discussed by the parties in their briefs. There is, however, no simple absolute rule of law which can be applied to resolve this dispute. As stated in Fin Hay Realty Co. v. United States, 68–2 U.S.T.C. ¶ 9438 (CA 3, 1968):

> While the Internal Revenue Code of 1954 was under consideration, and after its adoption, Congress sought to identify the criteria which would determine whether an investment represents a debt or equity, but these and similar efforts have not found acceptance. It still remains true that neither any single criterion nor any series of criteria can provide a conclusive answer in the kaleidoscopic circumstances which individual cases present.

A similar statement by the Court of Appeals for this circuit appears in Moughon v. Commissioner of Internal Revenue, 329 F.2d 399, 401 (CA 6, 1964).

■■ While the decided cases have applied many varying criteria to particular transactions in attempting to ascertain the tax treatment to be accorded thereto the inquiry has always been directed to one end: what was the true nature of the transaction in question? In that regard it has uniformly been held that labels are not controlling and that substance prevails over form. The decisive factor is not what the payments are called but what, in fact, they are, and that depends upon the real intention of the parties. Byerlite Corp. v. Williams, 286 F.2d 285, 290 (CA 6, 1960). Determination of a taxpayer's true intent does not rest on formal manifestations alone, but must be tested in light of objective factors also. Fellinger v. United States, 238 F.Supp. 67, 75 (D.C.N.D., Ohio, 1964). Byerlite Corp. v. Williams, supra, contains the following proposition:

> The cases hold that, for tax purposes, transactions are to be disregarded if they are a sham or masquerade, or if they take place between taxable entities which have no real existence. "The inquiry is not what the purpose of the taxpayer is, but whether what is claimed to be, is in fact." Kraft Foods Co. v. Commissioner [of Internal Revenue], 2 Cir., 232 F.2d 118, 128. In all cases, the prevailing consideration is that artifice must not be exalted over reality, whether to the advantage of the taxpayer, or to the government. id., at 291.

The *Byerlite* decision has been cited in support of the following statement, which bears heavily on the issues of this case:

> Although there is no one controlling factor or broad rule that can be used in deciding these cases, the courts have usually recognized advances or loans to a closely held corporation as creating a true debtor-creditor relationship where there is a demonstrable business purpose in making a loan and the transaction is not a tax-avoidance scheme or a sham or masquerade. J. S. Biritz Construction Co. v. C.I.R., 387 F.2d 451, 458 (CA 8, 1967).

This Court does not believe that it is necessary to restate the law as reflected by the parties' briefs and the cases cited therein nor would it be productive to recite the liturgy of criteria applied in those holdings. Suffice it to say that the Court has examined the authorities cited, with particular attention to those decisions upon which primary importance has been placed by the parties. Plaintiff relies mainly on the *Biritz Construction Co.* case and the *Byerlite* decision, while the Government places heavy emphasis on the *Fin Hay Realty Co.* holding, and the *Fellinger* ruling.

Based upon the law which the Court has considered, it is the Court's conclusion that plaintiff should prevail herein. While recognizing that the advances in question would not satisfy many of the criteria applied in other cases for qualification as loans for tax purposes, the Court believes that the facts herein are peculiar unto themselves. We are here concerned with a situation where investors originally acquired an asset in the form of unimproved real estate with the intention of selling it as such. The acquisition cost, with all other expenses attendant thereto, does not exceed the value of the capital stock interests as presently constituted. Finding themselves unable to dispose of the land they then determined to develop a shopping center. This was their first such venture. Although they anticipated receiving all necessary funds from outside sources they soon found it necessary to use their own money for that purpose. There is no question but that the advances went into the corporation to keep the project alive. Without the continuing advances the entire project would have been lost.

There is no evidence on the record that the determination to recapitalize in 1957 on a 1 to 3 basis was done with an intent to evade taxes. It is the prerogative of stockholders of a corporation to determine how much of their funds they care to risk in the form of capital and how much, if any, they are willing to lend as credit. If the real intent is to make an actual loan that intent must be honored. Byerlite Corp. v. Williams, 286 F.2d 285, 290. It appears to the Court that when the shareholders were required to advance funds to compensate for their inability to acquire permanent financing it would be reasonable for such advances to have been intended to be true loans.

The recapitalization, in fact, transferred on the books of the corporation sums previously shown in the shareholders' loans payable accounts to surplus, thereby resulting in a diminution of the outstanding loans according to the corporation's ledgers. That action would have reflected a strengthening of the corporation's financial base for presentation to outside lenders. There is evidence from which it might be inferred that the recapitalization was undertaken for precisely that purpose. The Board minutes of August 13, 1957, at which the recapitalization was first proposed, indicate that the Jefferson Standard Life Insurance Company had under consideration plaintiff's loan application for $750,000 and was to be advised of the change in the stock structure of the company. It may be noted that prior to the reorganization the notes issued to shareholders were 6% demand notes without any subordination provision. The issuance of the subordinated notes with a two-year

maturity date first occurs as a part of the recapitalization, another possible concession to attract outside construction funds.

The Court recognizes that there is a discrepancy between the recapitalization structure allocating $96,000 to capital stock and the prior corporate resolution ostensibly contributing $128,000 in advances to paid-in surplus. The resolutions of June and July, 1955 relating to the $128,000, however, are equivocal and themselves not consistent with an intent to unconditionally commit the funds to surplus. Both resolutions indicated that upon an improvement of the corporation's financial condition an attempt would be made to repay the advances. The financial statement references after July, 1955 to "capital contributions" as being subject to withdrawal upon approval of the Board of Directors is completely inconsistent with true paid-in surplus, particularly where the Board of Directors and the capital contributors are the same persons. It has already been noted that the resolutions and financial statements under discussion do not themselves correspond with the corporation's internal accounting wherein the advances were continued to be carried as notes payable. It is the Court's opinion that all of the foregoing taken together responds to the shareholders' expressed intention to have the advances considered as loans by the corporation while representing to potential lenders that the prior advances would be subordinated to new money and were available to insure the financial integrity of the corporation. The fact that even after the recapitalization the corporation continued to show the balances in the shareholders' notes payable accounts under surplus on its financial statements lends weight to the conclusion that this was being done to attract outside money to meet construction expenses.

In support of its contention that these advances were in fact equity investment rather than loans the Government, in its brief, has made two extensive presentations to attempt to demonstrate the claimed distinction between true loans and the shareholders' advances.

The first presentation is a side by side comparison of the $60,000 Ganger investment, allocated $15,000 to capital stock and $45,000 to loans, and the $100,000 Ganger loan transaction.

The first problem with this demonstration is the Government's contention that the $100,000 was not a shareholders' loan. In light of the stipulation that as to their investment in the plaintiff corporation the Gangers were acting cooperatively, the Court does not see how their interests can be divided by the Government to frame an argument based thereon. This is particularly so considering that A. H. Ganger was signatory to the original purchase agreement from which the Ganger stock interest arose.

The next problem with this demonstration is that the Ganger transaction occurred after a substantial portion of the shareholders' advances had been made and that new terms and conditions were created relative to those advances at the instance of the Gangers. Many of those new terms and conditions are relied upon by the Government in its argument that the advances should not be considered loans. The Court does not believe that any theory of relation back can be thus applied.

It is the Court's opinion that the record herein fairly permits an inference to be drawn that the acquisition by the Gangers of a stock interest in the plaintiff was for the purpose of protecting their investment, including the $100,000 loan, and was disposed of when the need for such protection no longer existed. The record indicates that the Gangers entered the picture after the plaintiff was unable to secure all the funds it required from the Union Savings and Trust and the original shareholders were no longer able to supply the deficiency. As a part of the contract with the Gangers the original shareholders agreed that the maturity dates of all outstanding notes would be extended so that they would become due and payable at the same time

as any notes issued to the new share-holders. It was also agreed that regardless as to the due dates payments would only be called for with the approval of all parties. At the suggestion of the Gangers the outstanding notes were then recalled and new notes issued specifically incorporating the terms of the contract and containing a specific recital that principal and interest would be payable on the unanimous approval of all parties to the contract. By the means of obtaining a stock interest in the plaintiff corporation and conditioning any payment of shareholders' notes on the unanimous approval of the parties to the contract, the Gangers were thus placed in a position of being able to insure that no money would be paid on the shareholders' loans prior to complete liquidation of the $100,000 loan. The $100,000 loan appears to have been paid by October 31, 1964. In December, 1964 the Gangers transferred their stock interest in the plaintiff corporation to Messrs. Farinacci and Kapel, but the $45,000 loan account was not transferred to the acquiring parties for another year. While the record is silent as to the said transfer it would be unreasonable to assume that they were without consideration, and the logical explanation for the lapses of time between the payment of the $100,-000 loan to the transfer of the stock to the transfer of the loans is that during the interim periods the transferees were acquiring the money to pay the Gangers. The Court cannot believe that the acquisition by the Gangers of a stock interest in the plaintiff corporation virtually contemporaneous with the making of the alleged unrelated $100,000 loan, the vesting of a veto power in an individual shareholder over the repayment of any shareholders' loans, and the surrender by the Gangers of the said stock interest soon after the payment in full of the $100,000 loan are mere coincidences.

Based on all the foregoing, the Court does not believe that any weight can be accorded to the evidence of changes in the plaintiff's structure or finances arising out of the Ganger transaction in resolving the question of whether the shareholder advances were intended to be loans.

The Government's second demonstration is a listing of fourteen factors which it contends militates against a determination that the advances were loans.

Of these fourteen factors, four arise from the Ganger transaction. The Government contends that the advances had no fixed maturity date, no fixed rate of interest, no unconditional obligation to repay, and required shareholder approval for redemption. While it is arguable that those conditions did exist after the Ganger transaction they did not exist prior thereto. As previously stated, this Court will not penalize the plaintiff by reason of the conditions imposed upon it in order to secure the Ganger loan.

Two of the factors relied upon by the Government are identity of interest between the shareholders and noteholders and voting power in the noteholders. If such criteria were of major importance any advance to a closely held corporation by a shareholder would necessarily be considered equity. The law does not so hold.

Reference is also made to the nomenclature applied to the advances on the corporation's financial statements and the fact that the debts were subordinated to general creditors. The Court has heretofore discussed those aspects of the plaintiff's financial problems. Only the conclusion that those factors were consistent with a continuing effort to secure conventional outside financing will be restated at this point.

The Government also refers to adequacy of capitalization. The decided cases indicate that this corporation's capitalization would not be considered as "thin."

The factors of provision for retirement, source of repayment and risk may be considered together. The Government points out that these advances had no sinking fund or other means of retire-

ment, would have to be repaid from earnings and profits, and must be considered high risk. It is stated:

> In the instant case, the risk of the noteholders is identical to the risk undertaken with respect to their stock investments * * * The shareholders had no reasonable expectation of repayment if the venture was not a success.

This is certainly true. But it must be viewed in light of this corporation's financial plight. If the shareholders did not make the advances as the circumstances required to meet construction expenses the entire project would have been lost. If they had taken mortgages to secure their advances or had not subordinated their advances to future creditors they most certainly would have destroyed their already frustrated efforts to obtain outside financing. What the Government is in effect arguing is that when a corporation is in a position of financial distress any additional funds which are invested by a shareholder which in actual fact are at the risk of the corporation must be considered equity. Such a view is not sustained by the reported decisions, and is particularly refuted by the decision of the Sixth Circuit Court of Appeals in the *Byerlite* case, 286 F.2d 285, 293.

The thirteenth factor cited by the Government is timing of the advances. The case authority relied upon for this point, Smith v. Commissioner of Internal Revenue, 370 F.2d 178 (CA 6, 1966) does not support the argument based thereon. In the *Smith* case the reference is to "the timing of the advance with reference to the organization of the corporation." The facts therein showed that of $237,-450 in advances to a corporation by its sole shareholders, $216,950 were made in the first two years of its eight-year corporate life. That is not comparable to the record herein. The Court must al-

so take note of the fact that in this case once the need for continuing advances to meet construction expenses arose such advances do not appear to have been made based on any formula keyed to maintaining a uniformity of ownership ratio among the investors or based on stockholdings, but rather appear to have come from the shareholder who could afford the burden at that time.

The final factor discussed by the Government is business purpose. As should be readily apparent, this is the factor which the Court considers critical in this case. The case authorities cited by the Government serve to point up what this Court believes to be the key to this entire problem. Fin Hay Realty Co. v. United States, 68–2 U.S.T.C. ¶ 9438 (CA 3, 1968), Fellinger v. United States, 238 F.Supp. 67 (D.C.N.D.Ohio 1964) and Brake & Electric Sales Corporation v. United States, 185 F.Supp. 1 (D.C.Mass., 1960) each represents a factual situation wherein an investor or investors made a lump sum investment to acquire an existing capital asset. In each case the investment was allocated between equity and debt. In Arlington Park Jockey Club, Inc. v. Sauber, 262 F.2d 902 (CA 7, 1959) the investors acquired a professional football franchise with a past history of losing money and a doubtful future. The initial capitalization was $30,-000 in equity and $200,000 allocated to debt. Thereafter, as the corporation sank deeper into insolvency, the investors each advanced an additional $127,500 in contributions of $100,000, $25,000 and $2,500. The final $55,000 in advances were made at a time when the corporation was already insolvent and in the process of selling all its assets for approximately $40,000. The court found from the facts that when the $100,000 advances were made it should have been obvious to the shareholders that repayment of the sums advanced was virtually hopeless.[5] So in each of the cases relied

---

5. It should be noted that this case concerned an investment in the Los Angeles Dons of the long defunct All-America Football Conference in a day when owner-ship of a professional football franchise was not the valuable commodity it is today.

**398**

upon by the Government we find the initial investment in a completely existing and functioning capital asset, with the obvious intention to retain the same in the form as acquired. In three of the four cases there are no continuing advances. In the fourth case the original capitalization was on a 1 to 7 ratio climbing to a 1–15 ratio and later advances were made when there was virtually no hope of recovery, even under a complete liquidation. Factually those cases are far removed from the instant case wherein the group of investors acquired undeveloped realty with the intent to sell the same, made small periodic advances, thereafter determined to develop the property with an expectation of obtaining 100% financing by construction loans, undertook construction and found that they were unable to secure outside money and were thus required to abandon the project or advance substantial amounts of their own money, recapitalized to reduce the equity-debt ratio to a 1 to 3 level to attract outside capital and thereafter maintained that ratio, and where it appears that the corporation itself was solvent although not liquid. It is this Court's opinion that on its facts this case is more closely allied with the decisions in J. S. Biritz Construction Co. v. Commissioner of Internal Revenue, 387 F.2d 451 (CA 8, 1967) and Byerlite Corp. v. Williams, 286 F.2d 285 (CA 6, 1960), wherein shareholder advances were held to be true loans, than they are to the authorities relied upon by the Government. It is the Court's conclusion that the advances made to the plaintiff corporation by its shareholders were intended to be loans necessitated by the needs of the business, and that such intent must prevail.

Judgment will be entered in the plaintiff's favor.

This Memorandum is adopted as Findings of Fact and Conclusions of Law pursuant to Rule 52, Federal Rules of Civil Procedure.