Theodore B. LIVERNOIS TRUST of May 2, 1958, Theodore B. Livernois, Jr., and Albert L. Grigsby, Jr., Trustees, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

Alma G. LIVERNOIS, Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

Alma G. LIVERNOIS, Petitioner-Cross-Appellee,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Cross-Appellant.

Nos. 20141-20143.

United States Court of Appeals, Sixth Circuit.

Oct. 12, 1970.

Michael J. Mehr, Detroit, Mich., for appellants and cross-appellee; Jerry D. Luptak, Evans, Boyer, Luptak & Briggs, Detroit, Mich., on brief.

Issie L. Jenkins, Atty., Dept. of Justice, Washington, D. C., for appellee and cross-appellant; Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, William A. Friedlander, Attys., Dept. of Justice, Washington, D. C., on brief.

Before EDWARDS and McCREE, Circuit Judges, and KALBFLEISCH,* District Judge.

EDWARDS, Circuit Judge.

These cases present a complicated set of facts and at least one appellate issue of some importance in federal tax law. They were heard by the Tax Court which found for the Commissioner in an opinion containing a detailed statement of the cases and findings of fact and conclusions of law. (T.C. Memo 1969–111). We shall rely upon the Tax Court opinion for the details of the case and recite only those facts (most of which were stipulated) which are directly relevant to our decision.

 The basic issue presented by this appeal is whether this record supports the conclusion of the Tax Court that approximately $294,000 of payments made by five corporations owned or controlled by appellant, Theodore B. Livernois Trust, were loans to the Trust, as

* Honorable Girard E. Kalbfleisch, United States District Judge for the Northern District of Ohio, sitting by designation.

claimed by the taxpayers, or dividends, as claimed by the Commissioner and as found by the Tax Court.

The Theodore B. Livernois Trust was created May 2, 1958, by Theodore B. Livernois, Sr.,—one month before he died from an accidental gunshot wound. Livernois, Sr., conveyed to the Trust substantially all of his assets, including his stock in five corporations in which he was the sole or principal shareholder.[1] The Trust instrument provided that Livernois, Sr., would receive the income of the Trust for his lifetime and that on his death, his wife Alma would receive the income, with rights to invade the corpus. On her death the Trust was to terminate with distributions to children and grandchildren. The Trust instrument required the Trust to pay all debts and tax obligations of the settlor's estate.

The Trust instrument provided for four Trustees—Livernois, Sr., Theodore Livernois, Jr., Albert Grigsby, and Ed Degree. During all relevant times Trustees Livernois, Jr., and Albert Grigsby were not only the dominant Trustees, but were also members of the Boards of Directors of all five of the corporations which made payments to the Trust.

After Livernois, Sr.'s, death, his estate filed its tax return. On I.R.S. audit an additional assessment of $61,000 was made. In addition, the I.R.S. made a joint assessment against Theodore Livernois, deceased, and Alma Livernois for $123,000 tax deficiencies (including fraud penalties) for the prior years 1950–1955. Neither Livernois, Sr.'s estate nor the Trust had money to pay these tax liabilities and the I.R.S. threatened to file liens upon the five corporations owned by the Trust. Livernois, Jr., and Grigsby, Trustees of the Trust, then caused the five corporations, of which they were also officers and directors, to make certain payments to meet the Trust obligations just referred to. These payments are summarized in this record as follows:

| Name of Corporation | 1958 | 1959 | 1960 | 1961 | 1962 | 1963 | Totals |
|---|---|---|---|---|---|---|---|
| Supply | $22,000.00 | $ 9,500.00 | $ 2,000.00 | | | | $ 33,500.00 |
| Ohio Lumber | | 20,333.41 | 70,000.00 | $12,000.00 | | $46,000.00 | 148,333.41 |
| Greenfield | | 1,000.00 | 14,000.00 | 23,500.00 | $26,501.00 | 11,000.00 | 76,001.00 |
| Blue Water | | 9,000.00 | 9,000.00 | 9,000.00 | 3,000.00 | 1,000.00 | 31,000.00 |
| Style King | | | | 6,000.00 | | | 6,000.00 |
| TOTALS | $22,000.00 | $39,833.41 | $95,000.00 | $50,500.00 | $29,501.00 | $58,000.00 | $294,834.41 |

[A2806]

During the years in question, aside from these payments, the Trust had only about $30,000 of income. The earned surplus of the corporations during the years concerned is shown as follows:

| Name of Corporation | 1959 | 1960 | 1961 | 1962 | 1963 |
|---|---|---|---|---|---|
| Supply | $ 59,011.39 | $ 52,766.95 | $ 52,142.37 | $ 63,423.15 | $ 51,890.74 |
| Ohio Lumber | 477,122.42 | 391,764.54 | 369,436.24 | 352,438.80 | 332,156.21 |
| Greenfield | 111,181.08 | 97,929.67 | 100,141.39 | 103,279.82 | 109,490.78 |
| Blue Water | 86,857.56 | 105,871.37 | 119,598.82 | 128,247.84 | 139,238.23 |
| Style King | 3,495.55 | 5,150.09 | 7,398.70 | (11,336.16) | (25,446.67) |

[A2805]

---

1. Actually, the stock was conveyed to Teal, Inc., a holding company wholly-owned by the Trust, which acted as alter ego for the Trust in many of these transactions. The opinion assumes that the actions of Teal, Inc., were the actions of the Trust for all legal purposes.

Every payment by the corporations to the Trust was recorded as a loan and an unsecured "demand" note bearing 6% interest was given in exchange. Generally, the notes were entered on the books of the corporations as receivables, but the interest was not. No interest was ever paid. No demand for payment was ever made. In one year $4,000 was repaid, but in that same year $95,000 was transferred from the corporations to the Trust.

Appellants assert that the payments were bona fide loans and that there was a plan for repayment of them through liquidation of some of the Trust assets. As to Trust contentions the Tax Court found:

"After consideration of all the evidence, we conclude that at the time of the payments there was no intention or expectation that they would be repaid and that they are properly taxable as dividends.

"We are not persuaded that at the time of the payments the Trust intended to repay the Corporations. The Trust was the sole shareholder of Supply, Ohio Lumber, and Style King. It was the 70 percent majority shareholder of Blue Water and the 75 percent majority shareholder of Greenfield. The balance of the stock of the latter two corporations was owned by Theodore Sr.'s three children. This stock represented substantially all of the Trust's assets. By 1960, due to the disposition of certain other property held by the Trust, the stock was the Trust's sole asset with the exception of a house and lots which had been mortgaged for $20,000. We think it is clear from the record that the Trust had but one source from which it could acquire funds. That source was the Corporations which it controlled. In a factual situation such as this, transactions are subject to the closest scrutiny. See Elliott J. Roschuni, 29 T.C. 1193 (1958), affd. per curiam 271 F.2d 267 (C.A.5, 1959), certiorari denied 362 U.S. 988, 80 S.Ct. 1074, 4 L.Ed.2d 1021 (1960).

"From the date of Theodore Sr.'s death, the Trust has looked to the Corporations whenever and for whatever purpose it required money. The Corporations paid money to the Trust without collateral and without any express limitation as to the ceiling amount of such payments. Though the notes accompanying these payments called for the payment of interest at the rate of 6 percent per annum, no interest was in fact paid to, or accrued by, the Corporations. Nor have there been any significant payments of principal by the Trust to the Corporations. In essence, the trustees have withdrawn from the Corporations whatever money they needed to administer the terms of the Trust Agreement. We hold that the petitioners have not met their burden of demonstrating that there was any real intention or expectation that the monies advanced to the Trust by the Corporations would ever be repaid.

"The testimony about liquidating Ohio Lumber and Blue Water as part of a repayment plan is vague and unconvincing. Initially there is no evidence that such a plan was conceived when the withdrawal of money from the Corporations began. Nor are we convinced that such a plan was in any way a realistic consideration in the decision to pay the money to the Trust.

"For the first time on brief petitioners argue that the loans from Ohio Lumber and Blue Water were in reality in furtherance of informal plans of complete liquidation and should be treated under section 331(a) (1). They further argue that to the extent the money advanced by the Corporations was used to pay Federal estate taxes, Michigan inheritance taxes, and funeral and administration expenses of the Estate, they are distributions in redemption of stock under section 303. Aside from the procedural point that these arguments were not raised until briefs were filed, the short answer is that neither of them is supported by the facts. Petitioners have not shown

the presence of an informal plan of complete liquidation for the purposes of section 331. Nor have they shown facts to support the existence of a redemption, that is, the acquisition of its shares by a corporation, for the purposes of section 303.

"In light of the foregoing analyses and because we have found that the earnings and profits of each Corporation exceeded the respective payments, we hold that the corporate payments are taxable as dividends."

Essentially the problem here is one of self-dealing between the Trustees of a trust and five corporations which those same Trustees controlled. In order to liquidate tax liabilities of the deceased Theodore B. Livernois, Sr., who is settlor of the Trust, the Trustees occasioned the five corporations to make payments of approximately $294,000. The Trust was completely devoid of funds to meet its liabilities or to contemplate repayment. No schedule of repayments was ever tendered or demanded. No interest was ever paid and the one repayment of $4,-000 was offset by payments to the Trust of $95,000 in the same year. The only "plan" for repayment advanced by the Trustees was not in existence when the corporation payments started and the liquidations which the "plan" contemplated soon proved not to be feasible. The Tax Court which heard the evidence characterized the testimony on the "repayment" plan as "vague and unconvincing."

This case is in large measure Berthold v. Commissioner of Internal Revenue revisited (404 F.2d 119 (6th Cir. 1968)). In *Berthold* this court employed language which we believe to be directly applicable to our instant case:

"Established authority holds that the intention of the parties is the controlling factor in determining whether or not advances should be termed loans. Chism's Estate v. Commissioner of Internal Revenue, 322 F.2d 956 (9th Cir. 1963); Clark v. Commissioner of Internal Revenue, 266 F.2d 698 (9th Cir. 1959).

"We note that Berthold testified directly on the critical issue of intent. He said that the $54,498.18 advanced was intended as a loan and was intended to be repaid. Such subjective testimony, however, can be technically true and still not controlling on the finder of the facts in this case. In this case 'the parties' are really one and the same. Here, Walberton Company had a large loss carryover in the year 1960. We have no doubt that taxpayers did intend the advances to be a loan—at least for federal tax purposes. But such testimony (pertaining to transactions between a taxpayer and two of his alter egos) can appropriately be viewed with some diffidence unless supported by other facts which bring the transaction much closer to a normal arms-length loan. Nasser v. United States, 257 F.Supp. 443 (N.D.Cal. 1966). The intention of the parties relates not so much to what the transaction is called, or even what form it takes, as it does to an actual intent that money advanced will be repaid. Commissioner of Internal Revenue v. Makransky, 321 F.2d 598 (3rd Cir. 1963). Normal security, interest and repayment arrangements (or efforts to secure same) are important proofs of such intent. And here such proofs are notably lacking." Berthold v. Commissioner, *supra*, 404 F.2d at 122.

██ It is certain that the form of a transaction (here the duly executed 6% notes) does not by itself control its nature, as opposed to the intent of the parties as demonstrated by the facts. Berthold v. Commissioner, *supra* at 121; Donisi v. Commissioner, 405 F.2d 481, 482 (6th Cir. 1968); Chism's Estate v. Commissioner, 322 F.2d 956, 959–960 (9th Cir. 1963); Regensburg v. Commissioner of Internal Revenue, 144 F.2d 41, 44 (2d Cir.), cert. denied 323 U.S. 783, 65 S.Ct. 272, 89 L.Ed. 625 (1944); Wiese v. Commissioner, 93 F.2d 921 (8th Cir.), cert. denied 304 U.S. 562, 58 S.Ct. 944, 82 L.Ed. 1529 (1938); 1 Mertens, Law of Federal Income Taxation § 9.21, at 70–71 (1969). In Commissioner of Internal

Revenue v. Makransky, 321 F.2d 598 (3d Cir. 1963), the Third Circuit said:

> "While in many cases various factors must be weighed in determining for income tax purposes the true character of a purported loan, there is one essential without which a transaction cannot be recognized as a loan. The parties must have entered into the transaction with the intention that the money advanced be repaid." Commissioner of Internal Revenue v. Makransky, *supra* at 600.

In Clark v. Commissioner, 266 F.2d 698 (9th Cir. 1959), the Ninth Circuit stated:

> "To constitute a distribution taxable as a dividend, the benefit received by the shareholder need not be considered as a dividend either by the corporation or its shareholders, declared by the board of directors, nor other formalities of a dividend declaration need be observed, if on all the evidence there is a distribution of available earnings or profits under a claim of right or without any expectation of repayment." Clark v. Commissioner, *supra* at 711.

We have reviewed this record and we cannot hold that the findings of fact of the Tax Court which we have been reciting above are "clearly erroneous." Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed. 2d 1218 (1960).

As to this issue, the decision of the Tax Court is affirmed.

■ The last issue sought to be raised before us by appellants in the Livernois Trust appeal was not at issue before the Tax Court and, hence, will not be dealt with on appeal. Burnet v. Commonwealth Improvement Co., 287 U.S. 415, 418, 53 S.Ct. 198, 77 L.Ed. 399 (1932).

■ We likewise affirm the Tax Court's opinion and decision in the Alma Livernois case. We agree that the sums disbursed to her by the Trust were paid within the terms of the Trust Agreement and, hence, were "properly paid" within the meaning of Title 26 §§ 661(a) (2)

and 662(a) (2) of the Internal Revenue Code of 1954.

The decisions of the Tax Court are affirmed.

McCREE, Circuit Judge (concurring).

I concur in the result reached by the court. My only difficulty with the opinion of the majority is its holding that we are bound by the "clearly erroneous" standard of review of Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). I believe that this is a case like Austin Village, Inc. v. United States, 432 F.2d 741 (6th Cir. 1970), rev'g 296 F. Supp. 382 (N.D.Ohio 1968), and Union Planters National Bank v. United States, 426 F.2d 115, 117 (6th Cir. 1970), where the objective indicia of the transaction are determinative of its legal consequences. Taxpayers here might have entertained a subjective belief (however unreasonable) that the corporations were lending money to the trust, but the facts recited in Judge Edwards' opinion make it clear that the economic reality of these transactions bore no relation to a bona fide loan. As this court said in Berthold v. Commissioner of Internal Revenue, 404 F.2d 119, 122: "Such subjective testimony, however, can be technically true and still not controlling on the finder of facts in this case. * * * The intention of the parties relates not so much to what the transaction is called, or even what form it takes, as it does to an actual intent that money advanced will be repaid. [Citation omitted.] Normal security, interest and repayment arrangements (or efforts to secure same) are important proofs of such intent. And here such proofs are notably lacking."

Thus the court in both *Berthold* and this case is examining the objective manifestations of the transactions in question. The existence *vel non* of such indicia is of course a question of fact. But the determination of the legal effect of the existence of these indicia is, in my view, a question of law, and we should not limit our review of a District Court's determination of such questions by the *Duberstein* standard.