**PIEDMONT MINERALS COMPANY, Inc., Appellee,**

v.

**UNITED STATES of America, Appellant.**

**No. 13677.**

United States Court of Appeals, Fourth Circuit.

Argued Feb. 4, 1970.

Decided July 29, 1970.

Stanley L. Ruby, Atty., Dept. of Justice (Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, Jonathan S. Cohen, Attys., Dept. of Justice, and William H. Murdock, U. S. Atty., on brief), for appellant.

Norman Block, Greensboro, N. C. (A. L. Meyland and Harry Rockwell, and Block, Meyland & Lloyd, Greensboro, N. C., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and WINTER and BUTZNER, Circuit Judges.

HAYNSWORTH, Chief Judge:

In this appeal we are faced with the oft-litigated question of whether advances made to a corporation by its principal stockholders constituted capital or debt for federal income tax purposes. The district court found the advances to be debt, and we affirm.

The historical facts are undisputed.

In 1934 John A. Boren and E. M. Harvey organized a small manufacturing plant to produce refractory products. This business, incorporated in 1938 as North State Pyrophyllite Company, Inc., prospered. Since the source of ore supply owned by North State was approaching exhaustion, a search for new deposits was made in the early 1950's. New ore deposits were located by Dan E. Stephens, an employee of North State, and analyzed by Mason K. Banks, a graduate geologist specializing in minerals who later became an employee of North State. Because the new deposits contained quantities of unusable minerals not present in the deposits being utilized at the time, it was determined that an extraction process would have to be developed and a plant constructed to make the new ore suitable for North State's operations. Banks was the only person associated with North State who possessed the necessary expertise. He, and later Stephens, who was needed to operate it, demanded a proprietary interest in the extraction process as a condition to their develop-

ment and operation of it. After some discussion, it was agreed that a new company would be formed in which Boren and Harvey would each own forty percent of the stock and Banks and Stephens would each own ten per cent. The company would be concerned with mining and processing the ore for sale to North State. Because neither Banks nor Stephens was able to make a financial investment of any size, it was agreed that the new company would be initially capitalized at $1,000, with Banks and Stephens each purchasing $100 worth of stock. The remaining funds necessary to start operations would be borrowed at the going rate of interest, either from a commercial bank with Boren and Harvey guaranteeing repayment or from Boren and Harvey themselves.

On May 21, 1958 articles of incorporation were issued to Piedmont Minerals Company, Inc. by the Secretary of State of North Carolina.

On five occasions beginning on June 2, 1958 and ending on January 1, 1960 Boren and Harvey made advances to Piedmont totaling $178,000.[1] As each advance was made, Piedmont executed and delivered to Boren and Harvey negotiable demand notes in the face amount of each advance bearing interest at the rate of 6 per cent per annum. The notes contained no subordination provisions and did not define or restrict the source from which principal or interest was to be paid. The 1958 notes were secured by an unrecorded chattel deed of trust. On each annual financial statement of Piedmont the amount of the notes was carried as "notes payable." Interest on the notes was paid as it accrued, and two notes totaling $8,000 were repaid in full on January 1, 1964. During this time no cash dividends were paid, but in 1962 and 1964 stock dividends were declared

---

| 1. Amounts advanced | | Date of Note |
|---|---|---|
| by Boren | by Harvey | |
| $15,000 | $15,000 | June 2, 1958 |
| $25,000 | $25,000 | July 3, 1959 |
| $25,000 | $25,000 | October 16, 1959 |
| $20,000 | $20,000 | December 15, 1959 |
| $ 4,000 | $ 4,000 | January 1, 1960 |

in proportion to the original holdings. In 1964 the outstanding capital stock was $50,000.[2]

In 1964 Piedmont anticipated repaying a substantial amount of the principal on the remaining loans. However, on September 11, 1964 the company was notified that the Internal Revenue Service might disallow the interest payments as a deduction for federal income tax purposes. Subsequently, on the advice of its attorney, Piedmont made all payments of principal and interest into an escrow account. By June 30, 1966 the entire principal of all of the Boren and Harvey notes had been repaid, or deposited in the escrow account. At that time the company had outstanding a note payable to the North Carolina National Bank in the amount of $50,000, representing a loan made by the bank during the previous year.

By letter dated April 19, 1965 the Commissioner of Internal Revenue disallowed the deductions for interest payments and asserted deficiencies and accrued interest of $10,365.77 against Piedmont for its taxable years ending June 30, 1961, 1962, and 1963. The basis for this assessment was the Commissioner's determination that the advances made by Boren and Harvey constituted capital investments and, hence, that the interest payments were not allowable deductions, but must be treated as a return on a capital investment. Piedmont paid the deficiency under protest and brought this action in the district court to recover it. The district court found in its favor, holding the advances to be true debt rather than capital contributions and the interest payments deductible.

In Road Materials, Inc. v. C.I.R., 4 Cir., 407 F.2d 1121, we held, at the government's urging, that the rule of Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218, applied to this type of situation and consequently that the classification of such advances as debt or equity is a question of fact. In this case the Government has shifted its position and now urges that we repudiate our holding in Road Materials and hold that the question is one of law.[3] We decline to do so.

■ Where the issue is one of fact, the findings of the district court will be reversed only if they are "clearly erroneous". This rule applies not only to the resolution of conflicting evidence but as well to ultimate factual inferences refined from undisputed subsidiary findings.[4] It is within the confines of this principle that we must evaluate the result reached by the district court.

■ Boren and Harvey had the financial and corporate resources to obtain the ore from the new deposits through their existing company or through a wholly owned subsidiary. However, they lacked the skills requisite to develop the

---

2. In 1959 and 1960 Piedmont operated at a loss. The company showed small profits in 1961 and 1962. From 1963 to the present it has shown substantial profits.

3. In support of its position the government cites Berkowitz v. United States, 5 Cir., 411 F.2d 818. While that case does hold the ultimate inference to be one of law, the holding is unnecessary to the result. It is manifest that under any standard of review the transaction at issue in Berkowitz would have been held to be a capital contribution rather than true debt.

4. See Jewell Ridge Coal Corp. v. C. I. R., 4 Cir., 318 F.2d 695. To be sure, in making this determination of fact the district court must apply relevant legal principles, and a factual determination made in disregard of the applicable principles of law, or made through gross overemphasis on one relevant principle to the exclusion of others, will be reversed because of the application of an improper legal standard. This is not the case here.

The principles relevant to a determination of debt or equity have been restated in many cases, including Berkowitz, supra, 411 F.2d at 820, cited by the government. The characterization of the ultimate issue as one of fact, and the resulting diminution of the scope of review, does not, of course, affect the requirement that the legally relevant factors be applied in making the determination.

extraction process, and their primary concern was to retain Banks and Stephens, whose skills were essential for that purpose and who demanded an equity interest in the process. Thus Piedmont's corporate characteristics were determined not, as the government asserts, by parties simultaneously occupying both sides of the bargaining table, but by the economic and practical necessity created by the demands of Banks and Stephens. Had Boren and Harvey invested more money in Piedmont's stock it would have been impossible to bring in Banks and Stephens with the proportionate interest they required. The characterization of the transaction as a "tax dodge," and thus somehow especially suspect, is therefore improper. In all respects the advances were treated as true debt. They were evidenced by demand notes [5] executed in proper form bearing a stated rate of interest which was equivalent to commercial rates. The interest was paid promptly at regular intervals; two notes had been entirely repaid before the character of the transactions was first questioned, and a substantial amount had been set aside for further repayment. The notes were unsubordinated;[6] indeed, at the time they were finally repaid fully, a sizeable commercial loan remained outstanding. While the advances, as between Boren and Harvey, were in proportion to their respective equity interests, they were not in proportion to the total interest in Piedmont. Banks and Stephens, owning twenty per cent of the stock, made no advances and received no financial return. The stock dividends were the only distributions made in proportion to the original investment. While the advances were made with little or no security, the district court found that the risk of Piedmont's business failure was minimal.[7] In fact, Piedmont was able to repay all the advances.

Considering all of these facts collectively we conclude that the district court's findings of fact and the ultimate inference that the advances constituted true debt are not clearly erroneous.

Affirmed.

5. The absence of a fixed maturity date is a relevant consideration, but it is far from controlling. The maturity of a demand note is always determinable by its holder. Much commercial debt is evidenced by demand notes. If Piedmont's financing had been provided by a bank under a guaranty agreement with Boren and Harvey, in which event the government would never have questioned the deduction of interest payments, it would not have been unusual for the advances to be evidenced by demand notes. There is little substantial difference between such notes and term notes given and taken with a mutual expectancy of renewal unless renewal appeared to the creditor to be adverse to his interest. In the context of stockholder loans, other considerations are of much greater significance.

6. The government contends that this finding is clearly erroneous, based on Harvey's testimony that he would, if necessary, have deferred demanding repayment of his notes until the bank loan was repaid. This contention is frivolous. Subordination is determined by the legal rights of the creditor, not by his intentions and motives. The fact that Boren and Harvey were stockholders as well as creditors necessarily affected their decisions and renders the ultimate issue in this case ambiguous. It does not, as the government appears to contend, determine that issue.

7. The government sharply attacks this finding, contending that the evidence showed a very high risk of business failure. The argument ignores the fact that at the commencement of business Piedmont had a guaranteed market for all of the ore which it could extract and that all parties were then satisfied that the extraction process could be developed successfully. The fact that, after two years of initial losses, Harvey began to have doubts about Piedmont's ultimate success, is irrelevant to what Piedmont's prospects were, in fact and as seen by the parties, at the time the venture was agreed upon. To contend that Piedmont did not have a ready market, when in fact the sole reason for its organization was to supply North State with raw materials of which it was in critically short supply, simply ignores reality.