RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0133p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

INDMAR PRODUCTS CO., INC.,

*Petitioner-Appellant,*

*v.*

No. 05-1573

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

---

On Appeal from the United States Tax Court.
No. 03-15428.

Argued: December 6, 2005

Decided and Filed: April 14, 2006

Before: MOORE, ROGERS, and McKEAGUE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Matthew P. Cavitch, BOGITAN LAW FIRM, Memphis, Tennessee, for Appellant. Teresa T. Milton, UNITED STATES DEPARTMENT OF JUSTICE, APPELLATE SECTION TAX DIVISION, Washington, D.C., for Appellee. **ON BRIEF:** Matthew P. Cavitch, G. Patrick Arnoult, BOGITAN LAW FIRM, Memphis, Tennessee, for Appellant. Teresa T. Milton, Richard Farber, UNITED STATES DEPARTMENT OF JUSTICE, APPELLATE SECTION TAX DIVISION, Washington, D.C., for Appellee.

McKEAGUE, J., delivered the opinion of the court. ROGERS, J. (pp. 13-16), delivered a separate concurring opinion. MOORE, J. (pp. 17-19), delivered a separate dissenting opinion.

---

## OPINION

---

McKEAGUE, Circuit Judge. Indmar Products Co., Inc. ("Indmar") appeals the decision of the Tax Court to disallow interest deductions the company claimed for tax years 1998-2000, and to assess accuracy-related tax penalties for those years. The interest deductions relate to a number of advances made to Indmar by its majority stockholders over several years. Indmar argued at trial that the advances were legitimate loans made to the company, and thus it could properly deduct the interest payments made on these advances under 26 U.S.C. § 163(a). The Tax Court, following the position taken by the Commissioner of Internal Revenue (the "Commissioner"), disagreed, concluding that the advances were equity contributions and therefore the company could not deduct any purported interest payments on these advances. The court imposed penalties on Indmar based on the deductions. *Indmar Prods. Co., Inc. v. Comm'r*, T.C.M. 2005-32, 2005 T.C.M. LEXIS 31.

1

Upon review of the record, we conclude that the Tax Court clearly erred in finding the advances were equity. The Tax Court failed to consider several factors used by this court for determining whether advances are debt or equity, ignored relevant evidence, and drew several unsupported inferences from its factual findings. We reverse and find that the stockholder advances were bona fide debt.

## I. *BACKGROUND*

### A.    *Stockholder Advances to Indmar*

Indmar, a Tennessee corporation, is a marine engine manufacturer. In 1973, Richard Rowe, Sr., and Marty Hoffman owned equal shares of Indmar. In 1987, after Hoffman passed away, Richard and his wife, Donna Rowe, together owned 74.44% of Indmar, with their children and children's spouses owning the rest.

By all accounts, Indmar has been a successful company. From 1986 to 2000, Indmar's sales and costs-of-goods sold increased from $5m and $3.9m to $45m and $37.7m, respectively. In addition, Indmar's working capital (current assets minus current liabilities) increased from $471,386 to $3.8m. During this period, Indmar did not declare or pay formal dividends.

Since the 1970s, Indmar's stockholders have advanced funds to it, receiving a 10% annual return in exchange. Hoffman started the practice in the 1970s. Beginning in 1987, the Rowes (as well as their children) began to make advancements on a periodic basis. Indmar treated all of the advances as loans from stockholders in the corporate books and records, and made monthly payments calculated at 10% of the advanced funds. Indmar reported the payments as interest expense deductions on its federal income tax returns. Consistent with Indmar's reporting, the Rowes reported the payments as interest income on their individual income tax returns.

The parties did not initially document the advances with notes or other instruments. Beginning in 1993, the parties executed notes covering all of the advances at issue. Specifically, Indmar executed a promissory note in 1993 with Donna Rowe for $201,400 (i.e., her outstanding balance). The note was payable on demand and freely transferable, had no maturity date or monthly payment schedule, and had a fixed interest rate of 10%. In 1995, Indmar executed a similar promissory note with Richard Rowe for $605,681 (i.e., his outstanding balance). In 1998, when the outstanding transfers totaled $1,222,133, Indmar executed two line of credit agreements with the Rowes for $1m and $750,000. The line of credit agreements provided that the balances were payable on demand and the notes were freely transferable. In addition, the agreements provided a stated interest rate of 10% and had no maturity date or monthly payment schedule. None of the advances were secured.

Repayments of the advances were paid on demand, based on the needs of the stockholders, and not subject to set or predetermined due dates. The record indicates that between 1987 and 2000, the total advance balances ranged from $634,000 to $1.7m, and Indmar made purported interest payments between $45,000 and $174,000 each year.

The parties structured the advances as demand loans to give the Rowes flexibility as creditors. Moreover, as demand loans, the advances were treated by the Rowes as short-term debt under Tennessee law, thereby excepting interest payments from a 6% state tax on dividends and interest on long-term debts. Tenn. Code Ann. §§ 67-2-101(1)(B)(i), 67-2-102 (2005). Indmar, however, reported the advances as long-term liabilities on its financial statements to avoid violating loan agreements with First Tennessee Bank ("FTB"), its primary creditor, who required a minimum ratio of current assets to current liabilities.

In order to reconcile the treatment and execution of the advances as demand loans versus listing them as long-term debt in its financial reports, Indmar received waivers from the Rowes agreeing to forego repayment on the notes for at least 12 months. From 1989 to 2000, the notes to Indmar's financial statements disclosed that "The stockholders have agreed not to demand payment within the next year," and in 1992 and 1993, the Rowes signed written agreements stating that they would not demand repayment of the advances. Indmar did all of this under the direction of its accountant.

Despite the annual waivers, the Rowes demanded and received numerous partial repayments of the advances. Specifically, in 1994 and 1995, Richard Rowe demanded repayment of $15,000 and $650,000, respectively, to pay his taxes and purchase a new home. He also demanded repayment of $84,948, $80,000, $25,000, and $70,221 from 1997-2000 to pay litigation expenses, boat repairs, and tax expenses. Donna Rowe demanded repayment of $180,000 in 1998 for boat repairs. The Rowes made additional advances in 1997 and 1998 of $500,000 and $300,000, respectively. The balance of notes payable to stockholders on December 31, 2000, totaled $1,166,912.

As Indmar was a successful, profitable company, numerous banks sought to lend money to it. FTB worked hard to retain Indmar's business, made funds immediately available upon request, and was willing to lend Indmar 100% of the stockholder advances.

In its loan agreements with Indmar, FTB required the company to subordinate all transfers, including stockholder advances, to FTB's loans. FTB did not strictly enforce the subordination provision, however, as Indmar repaid – with FTB's knowledge – some of the stockholder advancements at the same time FTB loans remained outstanding. As an example, when Richard demanded repayment of $650,000 to purchase a new home, Indmar borrowed the entire amount from FTB at 7.5% (the prime lending rate was 8.75%). Indmar secured the loan with inventory, accounts and general intangibles, equipment, and the personal guarantee of the Rowes. Richard Moody, the FTB lending officer who worked with Indmar on the loan, testified that he knew Indmar used the proceeds to repay Richard. Indmar had loans outstanding with FTB at the time.

As stipulated by the parties, the prime lending rate ranged from a low of 6% to a high of 10.5% between 1987-1998. In 1997, Indmar and FTB executed a promissory note for $1m that was modified in 1998. The interest rate on the note (7.85%) was below the prime lending rate. Indmar also had a collateralized line of credit with FTB. Similar to the stockholder advances, the bank line of credit was used for short-term working capital. FTB charged the following rates for the secured line of credit:

>1995 – 9%
>1996 – 8.75%
>1997 – 9%
>1998 – 8%
>1999 – 8.75%
>2000 – 9.5%

(rates as of December 31st of each year).

## B.       *Claimed Deductions at Issue*

On its tax returns for 1998-2000, Indmar claimed deductions for the purported interest payments paid on the stockholder advances. The Commissioner issued a notice of deficiency. Indmar filed a petition in the Tax Court challenging the Commissioner's decision. After trial, the Tax Court concluded that the advances did not constitute genuine indebtedness and thus the

payments to the stockholders were not deductible. The Tax Court calculated a total tax deficiency of $123,735 and assessed $24,747 in penalties. Indmar timely appealed.

## II. *LEGAL ANALYSIS*

### A.    *Determining Whether Advance Is Debt or Equity*

As a general matter, the Commissioner's determination of a deficiency is entitled to a presumption of correctness. It is the taxpayer's burden to prove the determination to be incorrect or arbitrary. *Ekman v. Comm'r*, 184 F.3d 522, 524 (6th Cir. 1999).

The basic question before us is whether the advances made to the company by the stockholders were loans or equity contributions. Under 26 U.S.C. § 163(a), a taxpayer may take a tax deduction for "all interest paid or accrued . . . on indebtedness." There is no similar deduction for dividends paid on equity investments. Thus, if the advances were loans, the 10% payments made by Indmar to the Rowes were "interest" payments, and Indmar could deduct these payments. If, on the other hand, the advances were equity contributions, the 10% payments were constructive dividends, and thus were not deductible.

Over the years, courts have grappled with this seemingly simple question in a wide array of legal and factual contexts. The distinction between debt and equity arises in other areas of federal tax law, *see, e.g.*, *Roth Steel Tube Co. v. Comm'r*, 800 F.2d 625, 629-30 (6th Cir. 1986) (addressing the issue in the context of the deductibility of advances as bad debt under 26 U.S.C. § 166(a)(1)), as well as bankruptcy law, *see, e.g.*, *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 750 (6th Cir. 2001). The Second Circuit set out the "classic" definition of debt in *Gilbert v. Commissioner*: "an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof." 248 F.2d 399, 402 (2d Cir. 1957). "While some variation from this formula is not fatal to the taxpayer's effort to have the advance treated as a debt for tax purposes, . . . too great a variation will of course preclude such treatment." *Id.* at 402-03. The question becomes, then, what is "too great a variation"?

To determine whether an advance to a company is debt or equity, courts consider "whether the objective facts establish an intention to create an unconditional obligation to repay the advances." *Roth Steel*, 800 F.2d at 630 (citing *Raymond v. United States*, 511 F.2d 185, 190 (6th Cir. 1975)). In doing so, courts look not only to the form of the transaction, but, more importantly, to its economic substance. *See, e.g.*, *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 697 (3d Cir. 1968) ("The various factors . . . are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship."); *Byerlite Corp. v. Williams*, 286 F.2d 285, 291 (6th Cir. 1960) ("In all cases, the prevailing consideration is that artifice must not be exalted over reality, whether to the advantage of the taxpayer, or to the government.").

The circuit courts have not settled on a single approach to the debt/equity question. We elucidated our approach in *Roth Steel*, setting out eleven non-exclusive factors for courts to consider:

> (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of

outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments.

800 F.2d at 630. No single factor is controlling; the weight to be given a factor (if any) necessarily depends on the particular circumstances of each case. *Id.*; *see also Universal Castings Corp.*, 37 T.C. 107, 114 (1961) ("It is not enough when examining such a precedential checklist to test each item for its presence or absence, but it is necessary also to weigh each item."), *aff'd*, 303 F.2d 620 (7th Cir. 1962). In essence, the more a stockholder advance resembles an arm's-length transaction, the more likely it is to be treated as debt. *AutoStyle Plastics*, 269 F.3d at 750.

## B.    *Standard of Review*

We review the Tax Court's factual findings for "clear error" and its application of law *de novo*. *Vision Info. Servs., LLC v. Comm'r*, 419 F.3d 554, 558 (6th Cir. 2005); *Holmes v. Comm'r*, 184 F.3d 536, 543 (6th Cir. 1999). The circuits are split on whether the debt/equity question is one of fact or law, or a mixed question of fact and law. *Jaques v. Comm'r*, 935 F.2d 104, 106-07 (6th Cir. 1991) (collecting cases); *Roth Steel*, 800 F.2d at 629 (collecting cases). Earlier panels of this court have held that the question is one of fact. *Jaques*, 935 F.2d at 107; *Roth Steel*, 800 F.2d at 629; *Smith v. Comm'r*, 370 F.2d 178, 180 (6th Cir. 1966).[1] Accordingly, we review the Tax Court's findings for clear error.

Under the clear error standard, we give deference to the Tax Court's factual findings and inferences drawn from those findings. *Holmes*, 184 F.3d at 543 (citations omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985). Moreover, we afford even greater discretion to any credibility determinations made by the Tax Court. *Id.* at 575.

Yet, while our review is deferential, it is not nugatory. As we explained in *Holmes*, "an appellate court may reverse a lower forum's factual finding for clear error when, even though the record contains some evidence in support of the finding, consideration of the overall evidence leaves the reviewing court 'with the definite and firm conviction that a mistake has been committed.'" 184 F.3d at 543 (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 622 (1993); *Anderson*, 470 U.S. at 573). If the Tax Court's factual findings "were induced by an erroneous view not supported by substantial evidence or made without properly taking into account substantial evidence to the contrary," clear error exists. *People Helpers Found., Inc. v. City*

---

[1]This position was not, however, uniformly embraced by all judges of this circuit. For example, in *Livernois Trust v. Commissioner*, the lower court found that the stockholder advances were equity contributions. On appeal, the decision was affirmed under the clearly erroneous standard. 433 F.2d 879, 883 (6th Cir. 1970). In his concurring opinion, Judge McCree agreed that the lower court decision should be affirmed, but disagreed with the majority's deferential review:

> My only difficulty with the opinion of the majority is its holding that we are bound by the "clearly erroneous" standard of review of *Commissioner of Internal Revenue v. Duberstein*, 363 U.S. 278, 80 S. Ct. 1190, 4 L. Ed.2d 1218 (1960). I believe that this is a case like *Austin Village, Inc. v. United States*, 432 F.2d 741 (6th Cir. 1970), *rev'g* 296 F. Supp. 382 (N.D. Ohio 1968), and *Union Planters National Bank v. United States*, 426 F.2d 115, 117 (6th Cir. 1970), where the objective indicia of the transaction are determinative of its legal consequences. . . . Thus the court in both *Berthold* [*v. Commissioner*, 404 F.2d 119, 122 (6th Cir. 1968)] and this case is examining the objective manifestations of the transactions in question. The existence *vel non* of such indicia is of course a question of fact. But the determination of the legal effect of the existence of these indicia is, in my view, a question of law, and we should not limit our review of a District Court's determination of such questions by the *Duberstein* standard.

*Id.* at 883 (McCree, J., concurring).

*of Richmond*, 12 F.3d 1321, 1329 (4th Cir. 1993). Moreover, as explained by one of our sister courts which also applies the "clear error" standard to the debt/equity question,

> [The lower court] must apply relevant legal principles, and a factual determination made in disregard of the applicable principles of law, or made through gross overemphasis on one relevant principle to the exclusion of others, will be reversed because of the application of an improper legal standard. . . . The characterization of the ultimate issue as one of fact, and the resulting diminution of the scope of review, does not, of course, affect the requirement that the legally relevant factors be applied in making the determination.

*Piedmont Minerals Co. v. United States*, 429 F.2d 560, 562 n.4 (4th Cir. 1970); *see also Flying J, Inc. v. Comdata Network, Inc.*, 405 F.3d 821, 829 (10th Cir. 2005) ("Whether the [lower] court failed to consider or accord proper weight or significance to relevant evidence are questions of law we review *de novo*.") (quoting *Harvey ex rel. Blankenbaker v. United Transp. Union*, 878 F.2d 1235, 1244 (10th Cir. 1989) (citing *Pullman-Stan'd v. Swint*, 456 U.S. 273, 291-92 (1982))).

With these principles in mind, we now turn to the Tax Court's decision in this case.

## C.    Roth Steel *Factors*

After discussing some, but not all, of the *Roth Steel* factors, the Tax Court concluded that the Rowes' advances were equity contributions. Specifically, it found the following factors weighed in favor of equity: (i) Indmar did not pay any formal dividends (although this is not one of the *Roth Steel* factors); (ii) there was no fixed maturity date or obligation to repay; (iii) repayment came from corporate profits and would not be paid if there were not sufficient profits; (iv) advances were unsecured; (v) there was no sinking fund; and (vi) at the time advances were made, there was no unconditional and legal obligation to repay. The court found that several factors weighed in favor of debt: (i) Indmar reported the advances on its federal income tax returns as interest expenses; (ii) external financing was available; (iii) Indmar was adequately capitalized; (iv) the advances were not subordinated to all creditors; and (v) the Rowes did not make the advances in proportion to their respective equity holdings. The court concluded that the factors favoring equity "certainly outweigh" those favoring debt. *Indmar*, 2005 T.C.M. LEXIS 31, at *15.

As explained below, we find that the Tax Court clearly erred in concluding that the advances were equity contributions rather than bona fide debt. The Tax Court failed to consider several *Roth Steel* factors. It also did not address in its analysis certain uncontroverted testimony and evidence upon which the parties stipulated. Consideration of all of the record evidence in this case leaves us "with the definite and firm conviction that a mistake has been committed." *Holmes*, 184 F.3d at 543.

### 1.    *Fixed Rate of Interest and Interest Payments*

The first factor to which we look is whether or not a fixed rate of interest and fixed interest payments accompanied the advances. *Roth Steel*, 800 F.2d at 631. The absence of a fixed interest rate and regular payments indicates equity; conversely, the presence of both evidences debt. *Id.*; 7 Mertens Law of Fed. Income Tax'n § 26:28 ("A fixed interest rate is indicative of a deductible interest payment.") (collecting cases). In its findings of fact, the Tax Court determined that the advances were made with a 10% annual return rate. The court also found that Indmar made regular monthly interest payments on all of the advances.

The fixed rate of interest and regular interest payments indicate that the advances were bona fide debt. In its analysis, however, the Tax Court took a different view. Rather than analyzing these facts within the *Roth Steel* framework (i.e., as objective indicia of debt or equity), the Tax Court focused instead on why the Rowes made the advancements: it concluded that the Rowes

"characterized the cash transfers as debt because they wanted to receive a 10-percent return on their investment and minimize estate taxes." *Indmar*, 2005 T.C.M. LEXIS 31, at \*11. Yet, neither of these intentions is inconsistent with characterizing the advances as loans.

For tax purposes, it is generally more important to focus on "what was done," than "why it was done." *United States v. Hertwig*, 398 F.2d 452, 455 (5th Cir. 1968). "In applying the law to the facts of this case, . . . it is 'clear that the objective factors . . . are decisive in cases of this type.'" *Raymond*, 511 F.2d at 191 (quoting *Austin Village*, 432 F.2d at 745). It is largely unremarkable that the Rowes wanted to receive a return from their advances. Most, if not all, creditors (as well as equity investors) intend to profit from their investments. *Bordo Prods. Co. v. United States*, 476 F.2d 1312, 1322 (Ct. Cl. 1973). As long as the interest rate is in line with the risks involved, a healthy return on investment can evidence debt.

Of course, "[e]xcessively high rates would . . . raise the possibility that a distribution of corporate profits was being disguised as debt. Were such the purpose of an exorbitant interest rate, the instrument involved would probably not qualify as debt in form." *Scriptomatic, Inc. v. United States*, 555 F.2d 364, 370 n.7 (3d Cir. 1977) (citing William T. Plumb, Jr., *The Fed. Income Tax Significance of Corporate Debt: A Critical Analysis & A Proposal*, 26 Tax L. Rev. 369, 439-40 (1971)). The Tax Court found that the 10% rate exceeded the federal prime interest rate during most of the period at issue, as well as the rate charged by FTB on several of its loans to Indmar.

The record indicates that the 10% rate was not an "exorbitant interest rate" under the circumstances. Indmar had a collateralized line of credit with FTB, which, similar to the stockholder advances, was available for short-term working capital. The rate charged by FTB for the line of credit ranged between 8%-9.5%, a rate not much below the fixed rate of 10% charged by the Rowes. The rate differential makes financial sense when considering the differences in security – the FTB line of credit was secured while the Rowes' advances were not.[2]

As for the Rowes' desire to minimize their estate taxes, this also offers little to the analysis. "Tax avoidance is entirely legal and legitimate. Any taxpayer 'may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes.'" *Estate of Kluener v. Comm'r*, 154 F.3d 630, 634 (6th Cir. 1998) (quoting *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934) (L. Hand, J.)). The desire to avoid or minimize taxes is not itself directly relevant to the question whether a purported loan is instead an equity investment. Rather, such a desire is only tangentially relevant, by acting as a flag to the Commissioner and courts to look closely at the transaction for any objective indicia of debt.

Far from proving the Commissioner's position, the existence and consistent payment of a fixed, reasonable interest rate strongly supports the inference that the advances were bona fide loans.

## 2.        *Written Instruments of the Indebtedness*

"The absence of notes or other instruments of indebtedness is a strong indication that the advances were capital contributions and not loans." *Roth Steel*, 800 F.2d at 631. In its analysis, the Tax Court found that Indmar "failed to establish that, at the time the transfers were made, it had the

---

[2]The government took pains during trial to show that Indmar could have received a lower interest rate from FTB than its stockholders. Had the 10% rate been exorbitant, this would have been a useful line of inquiry. Under the circumstances here, the rate was not exorbitant, and whether Indmar could have received a better rate through FTB is of no import. To show bona fide debt, a taxpayer does not need to prove that it received the financially optimal rate, just a commercially reasonable one.

requisite unconditional and legal obligation to repay the Rowes (e.g., the transfers were *not documented*)." *Indmar*, 2005 T.C.M. LEXIS 31, at *15 (emphasis added).[3]

The Tax Court focused on only half the story. For years 1987-1992, the Rowes did make advancements without executing any notes or other instruments. Beginning in 1993, and for all the tax years at issue in this case, the parties executed notes of loans and lines of credit covering all of the advances at issue, as the Tax Court noted in its findings of fact. Yet, in its analysis of the *Roth Steel* factors, the Tax Court was silent as to the subsequent execution of notes. After-the-fact consolidation of prior advances into a single note can indicate that the advances were debt rather than equity contributions. *See, e.g.*, *Dev. Corp. of Am. v. Comm'r*, T.C.M. 1988-127, 1988 T.C.M. LEXIS 155, at *11. The Tax Court erred by focusing on the initial lack of documentation without addressing the subsequent history of executed notes.[4]

### 3.        *Fixed Maturity Date and Schedule of Payments*

"The absence of a fixed maturity date and a fixed obligation to repay indicates that the advances were capital contributions and not loans." *Roth Steel*, 800 F.2d at 631. Based on the Rowes' waivers, the Tax Court concluded that there was no fixed maturity date or fixed obligation to repay. While correct, we find that this factor carries little weight in the final analysis. The parties structured the advances as demand loans, which had *ascertainable* (although not fixed) maturity dates, controlled by the Rowes. *Piedmont Minerals*, 429 F.2d at 563 n.5 ("The absence of a fixed maturity date is a relevant consideration, but it is far from controlling. The maturity of a demand note is always determinable by its holder."). Furthermore, the temporary waiver of payment does not convert debt into equity "since [the stockholders] still expected to be repaid." *AutoStyle Plastics*, 269 F.3d at 751.

Where advances are documented by demand notes with a fixed rate of interest and regular interest payments, the lack of a maturity date and schedule of payments does not strongly favor equity. To give any significant weight to this factor would create a virtual *per se* rule against the use of demand notes by stockholders, even though "[m]uch commercial debt is evidenced by demand notes." *Piedmont Minerals*, 429 F.2d at 563 n.5; *see also AutoStyle Plastics*, 269 F.3d at 750 (cautioning against a "rigid" rule that the factor always indicates equity).

### 4.        *The Source of Repayments*

"An expectation of repayment *solely* from corporate earnings is not indicative of bona fide debt regardless of its reasonableness." *Roth Steel*, 800 F.2d at 631 (emphasis added). Repayment can generally come from "only four possible sources . . . .: (1) liquidation of assets, (2) profits from the business, (3) cash flow, and (4) refinancing with another lender." *Bordo Prods.*, 476 F.2d at 1326 (quoting Plumb, *supra*, at 526).

The Tax Court found that the "source of repayments" factor favored equity. It relied upon Richard Rowe's testimony that Indmar was expected to make a profit and that repayment "has to come from corporate profits or else the company couldn't pay for it." *Indmar*, 2005 T.C.M. LEXIS 31, at *14. The full colloquy from the testimony, however, is more equivocal:

---

[3] The Tax Court did count in favor of debt the fact that Indmar consistently reported the payments as interest expense on its federal taxes.

[4] The Tax Court was troubled by the treatment of the advances in the company's records as both demand debt and long-term debt. While we share the Tax Court's concerns, this was not the issue before the Tax Court or us on appeal. Importantly, regardless of whether it classified the payments as demand debt or long-term debt, the company *at all times* identified the advances as some form of debt. We leave it to the Tennessee authorities to determine whether Indmar owes any state taxes or penalties as a result of its reporting and accounting practices.

Q.       . . . [A]t the time that you made these advances, were you anticipating that the repayment was going to come from corporate profits?

A.       Yes, sir.  It has to come from corporate profits or else the company couldn't pay for it.  Unless it made profit – and I have always believed from the first day we started, that we were going to be profitable.

Q.       Was it your understanding and intent, at the time you made these advances, that if the company was not, in fact, profitable, you would not be repaid?

A.       I had no intentions of not being repaid, sir.

Q.       Why is that?

A.       I believe it's me.  It's my personality.

Q.       Is that because you intended to make a profit?

A.       Yes, sir.

There are at least two plausible ways to read this testimony.  One can read it the way the Tax Court apparently did – Rowe's testimony was, at best, contradictory: repayment must come from profits, but he had no intention of not being repaid, regardless of the company's fortunes.  Given the apparent contradiction, one should focus on the statement against Indmar's interest: Rowe admitted that repayment of the advances "has to come from corporate profits or else the company couldn't pay for it."  If repayment "has" to come from profits, then this would imply that repayment was tied to the company's fortunes, suggesting the advances were equity contributions.

Another way to read the testimony, however, is that Rowe, as a small businessman and unsecured creditor, believed that full repayment of all of Indmar's debt required a thriving, successful business, which, ultimately, required profits.  In other words, struggling companies near or at bankruptcy do not repay their debts, at least not dollar for dollar.  Under this reading, his testimony is consistent with debt.  In fact, we sounded a similar note in an earlier decision addressing the debt/equity issue: "One who makes a loan to a corporation also takes a risk, and while he may receive evidence of an obligation, payable in any event, often such obligation is never paid. . . . 'All unsecured loans involve more or less risk.'" *Byerlite*, 286 F.2d at 292 (quoting *Earle v. W.J. Jones & Son, Inc.*, 200 F.2d 846, 851 (9th Cir. 1952)).

If there was no other evidence to support one view or the other, we could not say that the Tax Court's reading was clearly erroneous.  Credibility determinations are left to the fact finder, and our review on appeal is strictly limited.  The "Tax Court 'is not bound to accept testimony at face value even when it is uncontroverted if it is improbable, unreasonable or questionable.'" *Lovell & Hart, Inc. v. Comm'r*, 456 F.2d 145, 148 (6th Cir. 1972) (quoting *Comm'r v. Smith*, 285 F.2d 91, 96 (5th Cir. 1960)).  On the other hand, the Tax Court cannot ignore relevant evidence in making its factual findings and any inferences from those findings.

Here, there is undisputed testimony by Rowe and the FTB lending officer, corroborated by stipulated evidence in the record, that clearly weighs in favor of debt on this factor.  Indmar repaid a significant portion of the unpaid advances – $650,000 – not from profits but by taking on additional debt from FTB.  While the interest rate on the FTB loan was lower than 10%, Indmar had to secure the bank loan with inventory, accounts and general intangibles, equipment, and personal guarantees.  Thus, Indmar repaid a significant portion of the unsecured stockholder advancements by taking on secured debt from a bank, rather than by taking the funds directly from earnings.  This is important evidence that the parties had no expectation that Indmar would repay the advances

"solely" from earnings.  The Tax Court did not discuss or even cite this evidence in its *Roth Steel* analysis.

### 5.          *The Extent to Which the Advances Were Used to Acquire Capital Assets*

Nor did the Tax Court address whether Indmar used the advances for working capital or capital expenditures.  "Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness." *Roth Steel*, 800 F.2d at 632. Richard Rowe testified that Indmar always went to a bank for funds to buy capital equipment.  He also testified that all of the advances he made to Indmar were used for working capital, as opposed to capital equipment.  This is uncontroverted testimony.  The government points, however, to Rowe's testimony that he advanced funds even when Indmar did not "need" the funds, and argues that this somehow cuts against his testimony that the advances were used as working capital.

The government's argument is unpersuasive.  We do not find that Rowe's testimony on this subject was "improbable, unreasonable or questionable," especially in the absence of the Tax Court addressing this factor in its analysis.[5]  A review of Indmar's financial statements shows that it used all of the funds it received in various ways, including working capital and capital equipment expenditures.  Thus, Indmar used the advances it received from the Rowes, even if not immediately upon receipt – i.e., Indmar identified a "need" for the advances at some point.  There is nothing specific in the record, including Indmar's financial statements, that suggests the advances went to purchase capital equipment as opposed to being used for working capital.  Accordingly, the government's supposition does not counter Rowe's testimony, and this factor squarely supports a finding of debt.

### 6.          *Sinking Fund*

"The failure to establish a sinking fund for repayment is evidence that the advances were capital contributions rather than loans." *Id.*  The Tax Court was correct to point out that the lack of a sinking fund favors equity.  This factor does not, however, deserve significant weight under the circumstances.  First, a sinking fund (as a type of reserve) is a form of security for debt, and the Tax Court also counted the general absence of security for the stockholder advances as favoring equity. Second, the presence or absence of a sinking fund is an important consideration when looking at advances made to highly leveraged firms.  In that case, the risk of repayment will likely be high on any unsecured loans, so any commercially reasonable lender would require a sinking fund or some other form of security for repayment.  Where a company has sound capitalization with outside creditors ready to loan it money (as here), there is less need for a sinking fund. *See Bordo Prods.*, 476 F.2d at 1326.

### 7.          *The Remaining* Roth Steel *Factors*

On the remaining *Roth Steel* factors, the Tax Court determined that one favored equity (lack of security for the advances) and four favored debt (the company had sufficient external financing available to it; the company was adequately capitalized; the advances were not subordinated to all creditors; and the Rowes did not make the advances in proportion to their respective equity holdings).  These findings are well-supported in the record.

---

[5]As the Tax Court did not address this factor, it made no credibility determinations with respect to Richard Rowe's testimony relating to the use of the advancements.  At one point in its decision the Tax Court did find that Rowe's testimony was "contradictory, inconsistent, and unconvincing" and that the parties "manipulated facts," but this was in specific reference to its discussion about the inconsistent treatment of the advances as demand debt and long-term debt. *See Indmar*, 2005 T.C.M. LEXIS 31, at *12-13; *see also supra* note 4.

**8.**        ***Failure to Pay Dividends***

The Tax Court included in its discussion of *Roth Steel* a factor not actually cited in that case – Indmar's failure to pay dividends. In support, the Tax Court cited our decision in *Jaques v. Commissioner*.

The relevance of *Jaques* to this case is questionable. That case involved the withdrawal of funds by a controlling stockholder from his closely-held corporation. The stockholder argued that the withdrawal itself was a loan. We rejected the argument, relying in part on the fact that the corporation had never issued a formal dividend, and thus the withdrawal could have been a disguised dividend. *Jaques*, 935 F.2d at 107-08. The situation here is the exact opposite – the stockholders were advancing money to the corporation (not from), and it is the nature of those advances that we must determine.

Had the Rowes charged Indmar an exorbitant interest rate, the lack of any formal dividends might have been relevant to showing that the payments were not interest payments, but disguised dividends. As this was not the case, *see supra* Section II.C.1, we do not address further the relevance, if any, of the lack of dividend payments to the debt/equity question presented here.

**D.**        ***The Tax Court Committed Clear Error***

To summarize, eight of the eleven *Roth Steel* factors favor debt. The three remaining factors suggest the advances were equity, but, as we explained above, two of the factors – the absence of a fixed maturity date and schedule of payments and the absence of a sinking fund – deserve little weight under the facts of this case. Moreover, the non-*Roth Steel* factor relied upon by the Tax Court – Indmar's failure to pay dividends – has questionable relevance to our inquiry. The only factor weighing in favor of equity with any real significance – the lack of security – does not outweigh all of the other factors in favor of debt. [6]

Accordingly, the trial evidence, when reviewed as a whole, conclusively shows that the Rowes' advances to Indmar were bona fide loans. The Tax Court committed clear error in finding otherwise.

## III. *CONCLUSION*

For the foregoing reasons, we reverse the Tax Court's determination that the stockholders' advances were equity contributions. We find that the advances exhibited clear, objective indicia of bona fide debt. Accordingly, we also reverse the Tax Court's assessment of accuracy-related penalties.

---

[6] Judge Moore in her dissent suggests that we give "minimal deference" to the conclusions of the Tax Court. We respectfully disagree. Much of our analysis is expressly predicated on the Tax Court's findings of fact. *See, e.g., supra* §§ II.C.1 & 2 (relying on the Tax Court's findings of a fixed 10% interest rate and regular interest payments, and documentation of advances from 1993-2000); 3 & 6 (accepting the Tax Court's findings of no fixed maturity date or schedule of payments, and no sinking fund, but concluding that these factors do not deserve significant weight under the circumstances); and 7 (accepting in full the Tax Court's findings on five of the *Roth Steel* factors). On the remaining two *Roth Steel* factors, we point to clear, uncontroverted evidence in the record favoring debt, evidence that the Tax Court unfortunately did not discuss in its *Roth Steel* analysis. On the issue of witness credibility, it is apparent from our analysis that we take issue not with any credibility determinations the Tax Court may have made as to Rowe's testimony on certain topics, but with the its failure to address evidence.

---

**CONCURRENCE**

---

ROGERS, Circuit Judge, concurring.  I concur fully in the majority opinion.  I write separately to explain why the legal, non-factual components of the tax court's analysis are properly examined on appeal without deference to the tax court, notwithstanding the overall "clearly erroneous" standard that our court has stated to be applicable to the determination of whether a particular transaction is debt or equity.

Whether an issue to be determined by the courts is one of fact or law is sometimes pretty simple.  But often, especially when the issue can be stated in the form of "Does the item before us fit within the legal definition of $x$?", the factual-versus-legal nature of the issue can be perplexing.  This is because the seemingly single question really has two different components:  "What is the nature of this item?" and "What is the legal meaning of $x$?"  In a case where there is total agreement between the parties as to the nature of the item, the question whether the item is an $x$ is a legal one.  In a case where there is total agreement between the parties as to the meaning of $x$, but a dispute as to the nature of the item, the issue of whether the item is an $x$ is totally factual.  Where there is some dispute on each of the two issues, the issue of whether the item is an $x$ is a mixed question of law and fact.

For instance, assume an ordinance taxes the keeping of pet dogs.  Jo is assessed a tax for keeping Fido, and Jo appeals.  The question "Is Fido a dog?" may be factual or it may be legal.  If Jo claims only that Fido is a really a cat, then the issue is factual.  No one argues that the legal definition of dog includes cats; the only dispute is regarding the actual nature of Fido.  On the other hand, if both parties agree that Fido is a prairie dog, the question "Is Fido a dog?" is a purely legal one.  There is no dispute about the nature of Fido; the only dispute involves what the legal meaning of "dog" is.  Of course if the city says Fido is a schnauzer while Jo says that Fido is actually a prairie dog, the question "Is Fido a dog" is mixed if *both* legal and factual aspects of the seemingly single question are in dispute.

We must be careful of the following type of error in the application of the doctrine of stare decisis to scopes of review for fact or law.  Assume that in one case the issue is whether Rover is a dog or a cat.  The appellate court in its opinion states that "under the ordinance the issue of whether an animal is a dog is subject to clearly erroneous review."  This is true for the reason, perhaps unstated, that there is no dispute as to the meaning of "dog" in the particular case.  Now in a second case the issue is whether a prairie dog Daisy is a "dog" under the ordinance.  The appellate panel, feeling bound by the statement in case one that "whether an animal is a dog is subject to clearly erroneous review," applies clearly erroneous review, i.e., deference to the trial court, on the purely legal issue of whether a prairie dog is taxable under the ordinance.  It should be obvious that such analysis is fallacious.

One way to express the fallacy is to say that the first case is distinguishable:  the first holding applies only to the extent that the issue in the first case was actually a fact issue.  Neither the reasoning nor the underlying facts of the first case lead to the conclusion that clearly erroneous review should apply in the second case.

The danger of applying clearly erroneous review in this scenario is not purely formal.  If deference is given to trial court determinations *of law* by a misapplication of stare decisis, this may lead quickly to the very types of inconsistencies that stare decisis doctrine seeks to avoid.  If one trial court thinks prairie dogs are taxable and another does not, and both decisions are given deference under a clearly erroneous standard, inconsistent law may be applied to similarly situated

persons, even after appeal to a single appellate court. This contravenes the most fundamental of legal precepts: the law should apply the same to everybody.

Similarly, if in a mixed fact-law case the first appellate panel had said the issue was subject to clearly erroneous review, this statement has to be interpreted to mean that where fact issues predominate, and a single scope of review rubric is useful, that rubric will be "clearly erroneous." But subissues of law will be reviewed independently. In other words, a holding in a mixed-question case that the scope of review is "clearly erroneous" is best interpreted to mean that where factual issues predominate, the predominant scope of review is "clearly erroneous." But to the extent that application of that overall scope of review requires some legal determinations, those legal determinations will be made de novo. Otherwise the appellate court will be in the despicable position of permitting the law to apply differently to indistinguishable facts.

Accordingly, I interpret the previous statements by this court that debt-vs.-equity determinations are subject to clearly erroneous review as holding that, where factual issues predominate, the overall scope of review can be characterized as "clearly erroneous," and that within such a generally applicable "clearly erroneous" scope of review, subissues of a clearly legal nature are reviewed de novo. To do otherwise would be to interpret our precedents as compelling us to decide differently on indistinguishable facts, merely because the lower courts read the law differently. Stated differently, I am fully persuaded that the words of Judge McCree in *Livernois Trust v. Commissioner*, 433 F.2d 879, 883 (6th Cir. 1970), and quoted in the majority opinion in footnote 1, not only reflect wisdom and insight, but also represent good law.

The various holdings that the debt-vs.-equity issue is subject to clearly erroneous review can be traced back to the Supreme Court's holding in *Commissioner v. Duberstein*, 363 U.S. 278, 291 (1960), a case involving whether each of two specific transfers — one between business associates and one by a church to a former employee — was a "gift" and therefore not subject to income tax. *Id.* at 280. The Supreme Court held that the issue was "basically one of fact" and therefore subject to "clearly erroneous" review when a lower court had made the determination without a jury. *Id.* at 290-91. The clearly erroneous rule applied as well "to factual inferences from undisputed basic facts, as will on many occasions be presented in this area." *Id.* at 291 (citation omitted). In *Duberstein*, however, the ultimate issue was whether or not the transfer was intended as "a recompense for past services, or an inducement for [taxpayer] to be of further service in the future." *Id.* at 292. In other words, there was little disagreement as to the legal standard (gift only if no intended recompense or inducement), but there was disagreement as to the ultimate fact of whether there was such intent. Considered this way, the issue was predominantly if not entirely one of fact. Transactions that look alike could have different tax consequences based on the underlying intent of the transferor. Almost always the issue will be predominantly factual. Thus, the Supreme Court logically deemed the gift-vs.-income issue in that case to be essentially factual. Cases following in the wake of *Duberstein* should not be interpreted, however, to require deference to lower court legal determinations, either where legal issues predominate, or where dispositive subissues are legal.

Moreover, a careful reading of our precedents does not compel deference to the legal aspects of the question whether an advance to a corporation is a loan or investment. In *Smith v. Comissioner*, we used the "clearly erroneous" rubric only in conjunction with the "sufficiency of evidence." 370 F.2d 178, 180 (6th Cir. 1966) ("Sufficient evidence existing in the record to form a basis for this determination, which is here found not to be clearly erroneous, it will not be disturbed by this court.").

In *Roth Steel v. Comissioner*, we characterized the overall issue of whether Roth Steel's unrepaid advances to a subsidiary corporation were loans, deductible as bad debts, or capital contributions, as one of fact subject to the clearly erroneous test. *See* 800 F.2d 625, 626, 629 (6th Cir. 1986). Our conclusion was that the tax court did not err when determining that the

contributions were capital because no interest was ever paid on the advances, the advances were not evidenced by notes, the debtor was undercapitalized, the source of repayment was contingent on the financial success of the debtor, and there was no fixed rate of interest. *Id.* at 630-32. In so concluding, we evaluated each of the relevant eleven factors independently, accepting the lower court's factual determination but applying relevant case law (apparently independently) to evaluate the weight of each factor. *See id.* at 629-32. Even if the statement in our opinion that the clearly erroneous scope of review applied could be read to say that deference was required with respect to our legal analysis of the weight of each factor, and to our legal balancing of all the factors, such a statement must be interpreted in light of how we applied that scope of review. What we actually did was use caselaw to weigh each of the relevant factors.

Our application of the clearly erroneous standard in *Jacques v. Commissioner*, moreover, is entirely distinguishable. That case did not involve whether an advance *to a business* was a loan or an equity investment, but rather whether a payment *by the business* was a dividend (i.e., not to be repaid) or a loan (to be repaid). *See* 935 F.2d 104, 107 (6th Cir. 1991). We reviewed the issue for clear error, relying on several previous cases holding that the issue was ultimately one of whether repayment was intended. *See Dietrick v. Comm'r*, 881 F.2d 336, 340 (6th Cir. 1989) ("The intention of the parties is the controlling factor in determining whether or not advances [from the business to the investor] should be termed as loans") (citation omitted); *Estate of DeNiro v. Comm'r*, 746 F.2d 327, 330-31 (6th Cir. 1984) (determination of whether corporate payment was a loan or a dividend depended on corporation's intent whether it expected to be repaid); *Wilkof v. Comm'r*, 636 F.2d 1139, 1140 (6th Cir. 1981) (per curiam) (issue was whether corporate payment was a dividend or a loan; *Duberstein* cited for "clearly erroneous" scope of review); *Berthold v. Comm'r*, 404 F.2d 119, 122 (6th Cir. 1968) ("Established authority holds that the intention of the parties is the controlling factor in determining whether or not advances [by corporations to shareholders] should be termed loans."). Such an intent issue, like the issue in *Duberstein*, is largely factual—the court knows what the standard is but needs to ascertain what is going on in someone's mind. This contrasts with the issue in the present case, which is only in small part determined by the intent of the transacting parties. It is undisputed that repayment was intended in this case; the issue is the legal nature of the transaction that manifested the intent.

Thus, in cases like the present one where the objective characteristics of a transaction have significant importance, our treatment of those objective characteristics does not require deference to the lower court. As we said in *Holmes v. Commissioner*, 184 F.3d 536, 543 (6th Cir. 1999) (emphasis added):

> On review, the Tax Court's *factual findings, and inferences drawn from the facts*, especially witness credibility determinations, are entitled to deference by the appellate court. . . . By contrast, the Tax Court's *application of legal standards*, and its legal conclusions, are reviewed *de novo*.

In my view, these cases are perfectly consistent with *not* deferring to the legal aspects of the lower court's reasoning, and avoidance of the fallacy described above requires us not to defer to such legal determinations. *See Livernois Trust*, 433 F.2d at 883 (McCree, J., concurring). Thus, while the majority opinion in this case cannot be faulted for stating that the overall scope of review in this case is "clear error," that conclusion must be interpreted to incorporate de novo review of legal questions necessary to our determination. Viewed in this way, the majority opinion's analysis is compelling.

In the instant case there is, to be sure, a limited factual aspect. One of the relevant *Roth* factors (the fourth) is whether repayment was intended to depend on company profit. 800 F.2d at 630. The tax court found that Indmar always intended to repay Mr. Rowe solely from profits because Mr. Rowe so testified. Clearly erroneous review requires substantial deference to this

conclusion, but even applying such deference it is necessary to reject the factual conclusion:  the undisputed facts show that it is not what happened.  Indmar repaid advances on two occasions by tapping its line of credit (i.e., when there was not sufficient profits to cover the demand amount).

More importantly, however, the facts relevant to all the remaining factors are simply not in dispute.  Even assuming that the payments were intended to be paid solely from profits, these other factors as a matter of law require the legal conclusion that the transactions represent debt rather than equity.  There is no dispute as to the content of the transactions, form of the obligation, perfect repayment history, Indmar's solid creditworthiness, Indmar's equity-heavy capitalization, respective ownership interest of the parties, subordination of the notes, and applicable market interest rates. These undisputed facts make the tax court's legal conclusion that Indmar's obligation was equity erroneous.  In other words, the extensive legal aspects of the question of whether these transactions amounted to debt are subject to our independent review, notwithstanding the applicability of a general "clearly erroneous" rubric to the overall question.  Or stated differently, because the issue in dispute in this case is predominantly legal, cases requiring "clearly erroneous" review are pro tanto distinguishable.  Either way, in a case like this one where a case that is largely factually indistinguishable could easily arise before a different lower court in the future, we must—to the extent that the facts are indeed objectively undisputed—rule in a way that insures consistent results. Applying "clearly erroneous" deference to lower court legal determinations, no matter how hidden or embedded such determinations are in overall determinations that are partly or even largely factual, is fundamentally at odds with the rule of law.[1]

---

[1]Indeed, commentators have expressed concern that there is no predictable legal distinction between loans to a business and equity investment, and that the unpredictability of this legal distinction is partially caused by the issue being "treated as one of fact to be resolved by applying vague standards . . . ."  *See* Stephen A. Lind, Stephen Schwarz, Daniel J. Lathrope & Joshua D. Rosenberg, *Fundamentals of Business Enterprise Taxation* 474 (3d ed. 2005).  These authors note, "Exhaustive research leaves one with the firm conviction that the courts are applying an amorphous and highly unsatisfactory 'smell test.'" *Id.*

———————

**DISSENT**

———————

KAREN NELSON MOORE, Circuit Judge, dissenting. I respectfully dissent because I believe that the Tax Court's conclusion that the shareholder advances to taxpayer were equity contributions rather than genuine debt is not clearly erroneous. Far from being left "with the definite and firm conviction that a mistake has been committed," *Holmes v. Comm'r*, 184 F.3d 536, 543 (6th Cir. 1999) (internal quotation marks omitted), I believe that the record provides significant support for the Tax Court's conclusion, and I would affirm.

The majority is of course correct when it states that in reviewing Tax Court decisions, we review factual findings for clear error and conduct a more searching de novo inquiry into legal conclusions of the lower court. *See Dow Chemical Co. v. United States*, 435 F.3d 594, 599 n.8 (6th Cir. 2006) (explaining that the employment of different standards of review for factual and legal conclusions is most consistent with Supreme Court precedent and concluding that the ultimate question of whether a transaction is an economic sham is a legal conclusion reviewed de novo); *Holmes*, 184 F.3d at 543. Similarly, I share the concern expressed by Judge Rogers that we must take care to avoid being unduly deferential to trial court determinations of law, particularly when we are considering questions like this "where factual issues predominate, [and thus] the predominant scope of review is 'clearly erroneous.'" Concurrence at 14. However, we must not be so concerned about avoiding being overly deferential that we fail to afford due deference to a lower court's determinations when our standard of review so requires. While other courts have concluded that the ultimate issue of whether a shareholder advance constitutes equity or debt is a question of law or a mixed question of law and fact that is reviewed de novo, we have repeatedly held that this specific question is a question of fact reviewed for clear error, and we remain bound by this precedent. *See Jacques v. Comm'r*, 935 F.2d 104, 106-07 (6th Cir. 1991); *Roth Steel Tube Co. v. Comm'r*, 800 F.2d 625, 629 (6th Cir. 1986), *cert. denied*, 481 U.S. 1014 (1987); *Smith v. Comm'r*, 370 F.2d 178, 180 (6th Cir. 1966). I am therefore troubled by the robustness of the majority opinion's clear error review of several of the factual aspects of this case as well as the ultimate question of whether the payments were debt or equity, and I believe that the majority has "misapprehended and misapplied the clearly-erroneous standard." *Anderson v. City of Bessemer City*, 470 U.S. 564, 566 (1985).

At the same time that the majority opinion acknowledges that we review for clear error the factual aspects of this case and the ultimate "debt versus equity" question, the majority's analysis fails fully to embody this standard. The clear-error standard does not permit us as a reviewing court to ignore the relevant credibility determinations made and relied upon by the lower court. A lower court's factual conclusions about the credibility of a witness must be treated with even greater deference, "for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id*. at 575. Richard Rowe was the primary witness to testify before the Tax Court, and Rowe provided much of the factual information to the court about the *Roth Steel* factors. To say that the Tax Court was unimpressed with Rowe's testimony is an understatement. The court called Rowe's testimony "contradictory, inconsistent, and unconvincing," and concluded that the taxpayer, "along with the Rowes, manipulated facts to attempt to make the transfers appear as debt and avoid certain legal consequences." Joint Appendix at 348 (Tax Court Op. at 11). Yet the majority appears largely to ignore the Tax Court's negative credibility determinations about Mr. Rowe, as it repeatedly describes Rowe's testimony as "uncontroverted" and credits his self-serving testimony over the contrary determinations of the Tax Court. The majority suggests in footnote five that the Tax Court's negative credibility determinations were limited to what can only be called the legal gymnastics of the taxpayer simultaneously to classify the shareholder advances as both demand loans and long-term debt. This is a strained reading of the Tax Court's opinion, which I believe

presents Rowe's credibility problems in more general terms, as part of the "particular circumstances of [the] case" that formed the factual backdrop for the Tax Court's determination that the advances were equity rather than debt. *Roth Steel*, 800 F.2d at 630.

The minimal deference that the majority gives to the conclusions of the Tax Court and the license it takes in positing alternative interpretations of the trial evidence to those of the Tax Court are also inconsistent with clear-error review. While I certainly agree that our review for clear error is not nugatory, "this standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson*, 470 U.S. at 573. Yet this is exactly what the majority does in several instances. When considering whether the record contained written instruments of indebtedness, the majority explains that unlike the Tax Court, it was more persuaded by the eventual execution of formal notes than the initial failure to document the advances. Later the majority states there are "at least two plausible ways to read" Richard Rowe's testimony about the source of repayments, and then opts for the opposite conclusion from that of the Tax Court. Majority Op. at 9. Thus while the majority's opinion may take the form of a clear-error review, in substance the majority "improperly conduct[s] what amount[s] to a *de novo* weighing of the evidence in the record." *Anderson*, 470 U.S. at 576.

Here the shareholder advances to Indmar are subject to "particular scrutiny" because, like advances between a controlling corporation and its subsidiary, "the control element suggests the opportunity to contrive a fictional debt." *Roth Steel*, 800 F.2d at 630 (internal quotation marks omitted). The taxpayer bears "the burden of establishing that the advances were loans rather than capital contributions." *Id.* (citing *Smith*, 370 F.2d at 180). The Tax Court's conclusion that Indmar failed to meet this burden was not clearly erroneous. While several of the *Roth Steel* factors support Indmar's claim that the shareholder advances were bona fide debt, several others instead favor equity. The unsecured nature of the shareholder advances "is a strong indication that the advances were capital contributions rather than loans." *Id.* at 631. Indmar's failure to establish a sinking fund is further "evidence that the advances were capital contributions rather than loans." *Id.* at 632. While the majority appears to view the absence of a sinking fund as redundant with the consideration that the transfers were unsecured, *Roth Steel* considers both as factors, and here both factors indicate equity. In addition, Indmar did not have any fixed maturity date or fixed obligation to repay the Rowes. This "indicates that the advances were capital contributions and not loans." *Id.* at 631. Nor did the Tax Court err in viewing Mr. Rowe's statement that repayment would have to come from corporate profits as a strong indicator of equity, because "[a]n expectation of repayment solely from corporate earnings is not indicative of bona fide debt regardless of its reasonableness." *Id.*

The majority and concurrence make much of the fact that the taxpayer had to turn to its bank line of credit when Rowe demanded the repayment of $650,000 of his advanced funds on short notice in 1995 so that he could buy a home in Florida. This was an anomalous occurrence in the many years of shareholder advances and repayments, the outstanding balances of which ranged from $600,000 to over $1.7 million over the years, and does not negate Rowe's statements that he made the advances with the expectation that he would be repaid from profits or the fact that all other repayments appear to have come from the taxpayer's profits. While I agree with my colleagues that the Tax Court should have acknowledged that in this instance the funds to repay the advances came from additional debt rather than profits, I agree with the Tax Court that overall the evidence suggests that repayment was expected to and did come from the taxpayer's profits, and therefore this factor favors equity.

In the particular circumstances of this case, which include the "contradictory, inconsistent, and unconvincing" testimony of the majority shareholder, I cannot conclude that it was clearly erroneous for the Tax Court to decide that the factors that favored equity were deserving of more weight than those that favored debt. Because I believe the record supports two permissible views

of the evidence, I cannot join the majority's conclusion that the Tax Court's determination was clearly erroneous.  *Anderson*, 470 U.S. at 574.  I would affirm the decision of the Tax Court.